# 14-402-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

NECA-IBEW PENSION TRUST FUND, DENIS MONTGOMERY,
on behalf of himself and all others similarly situated,

*Plaintiffs-Appellants,*

—against—

KENNETH D. LEWIS, BANK OF AMERICA CORPORATION, WILLIAM BARNET, III,
FRANK P. BRAMBLE, SR., JOE L. PRICE, JOHN T. COLLINS, NEIL A. COTTY,
GARY L. COUNTRYMAN, TOMMY R. FRANKS, CHARLES K. GIFFORD, STEVEN W.
JONES, WALTER E. MASSEY, THOMAS J. MAY, PATRICIA E. MITCHELL,

(*caption continued on inside cover*)

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

JEFFREY A. KLAFTER
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
(914) 934-9200

MARK L. KNUTSON
JEFFREY R. KRINSK
FINKELSTEIN & KRINSK
501 West Broadway, Suite 1250
San Diego, California 92101
(619) 238-1333

*Attorneys for Plaintiffs-Appellants*

TEMPLE O. SLOAN, THOMAS M. RYAN, MEREDITH R. SPANGLER, ROBERT L. TILLMAN, BANC OF AMERICA SECURITIES LLC, JACKIE M. WARD, CITIGROUP GLOBAL MARKETS INC., UBS SECURITIES LLC, WACHOVIA CAPITAL MARKETS, LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK SECURITIES, J.P. MORGAN SECURITIES INC., MORGAN STANLEY & CO. INCORPORATED,

*Defendants-Appellees,*

INCAPITAL LLC,

*Defendant.*

<u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant NECA-IBEW PENSION TRUST FUND is a public pension fund.

It has no parent corporations, subsidiaries or affiliates.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT....................................................................1

SUMMARY OF THE ARGUMENT.............................................................2

JURISDICTIONAL STATEMENT................................................................8

QUESTIONS PRESENTED...........................................................................8

I.    Statement of the Case......................................................................10

      A.    The Original Complaint.........................................................10

      B.    The First Amended Complaint................................................12

            1.    The Magistrates Judge's February 9, 2012 Complaint.........................13

      C.    The Second Amended Complaint.............................................14

II.   Standard of Review............................................................................16

III.  Argument............................................................................................17

      A.    LEGAL STANDARDS ON SEEKING LEAVE TO AMEND....................17

      B.    THE DISTRICT COURT ERRED IN SUSTAINING...................................22

            1.    The SAC's Improper Accounting Claims Were Not Time-Barred...... 27

            2.    The SAC's Countrywide Related Claims are Not Time-Barred..........33

      C.    THE PROPOSED SAC STATED A VIABLE SECURITIES ACT CLAIM....................................36

            1.    The 2/15/2013 Opinion Incorrectly Concluded That Material Misrepresentations Or Omissions Concerning Accounting Violations And BAC's Tier 1 Capital Base Are Non-Actionable.....................36

IV.   CONCLUSION...................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)................................................... 19, 20

*Baldwin County Welcome Ctr. v. Brown* 466 U.S. 147 (1984) ................... 31

*Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204
(S.D.N.Y. 2003) ........................................................................................31

*City of Pontiac General Employees' Retirement System v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ............................................................. 23,24,27

*Contemporary Mission, Inc. v. New York Times Co.*, 665 F. Supp. 248
(S.D.N.Y.1987) ....................................................................................... 32

*Dodds v. Cigna Sec. Inc.*, 12 F.3d 346 (2d Cir. 1993).................................. 23

*E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273
(S.D.N.Y. 2006) .....................................................................................17,19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
ChaseCo.*, 553 F.3d 187 (2d Cir. 2009)......................................................... 19

*Erickson v. Pardus*, 551 U.S. 89 (2007) ....................................................... 20

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...................................... 20

*Fogarazzo v. Lehman Bros.,* 341 F. Supp.2 d 274 (S.D.N.Y. 2004)............ 45

*Foman v. Davis*, 371 U.S. 178 (1962) ......................................................... 17

*Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171
(S.D.N.Y. 2010) ....................................................................................... 19

*Holdridge v. Heyer-Schulte Corp. of Santa Barbara*, 440 F. Supp. 1088
(N.D.N.Y. 1977) ....................................................................................... 30

*In re Allou Distributors, Inc.*, 379 B.R. 5 (Bankr. E.D.N.Y. 2007) ............. 31

*In re Bear Sterns Companies, Inc. Sec., Deriv. and ERISA Litig.*,
763 F. Supp .2d 423 (S.D.N.Y. 2011) ........................................................... 7

*In re Chaus Sec. Litig.*, 801 F. Supp. 1257 (S.D.N.Y. 1992) ................. 29, 30

*In re CitiGroup Inc. Bond Litigation*, 723 F. Supp. 2d 568
(S.D.N.Y. 2010) ...................................................................................... 38,39

*In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010)... 38,42

*In re Everfresh Beverages, Inc.,* 238 B.R. 558(Bankr. S.D.N.Y. 1999) ...... 30

*In re Fuwei Films Sec. Litig*., 634 F. Supp. 2d 419 (S.D.N.Y. 2009) .......... 21

*In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189
(S.D.N.Y. 2004) ............................................................................................ 18

*In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347 (2d Cir. 2010).. 21

*In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007). 22

*In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193 (E.D.N.Y. 2000)....... 22

*In re Vivendi Universal, S.A. Sec. Litig.,* 381 F. Supp. 2d 158
(S.D.N.Y. 2003) ............................................................................................ 19

*In re Wachovia Equity Sec. Litig.* 753 F. Supp. 2d 326 (S.D.N.Y. 2011)... 24

*In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007)............................ 21

*Iowa Pub. Emps'. Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137
(2d Cir. 2010)...............................................................................................22

*Lapin v. Goldman Sachs Group, Inc.,* 506 F. Supp. 2d 221
(S.D.N.Y. 2006)...........................................................................................19

*LC Capital Partners, L.P. v. Frontier Ins. Grp., Inc.*, 318 F. 3d 148
(2d Cir. 2003) .............................................................................................. 34

*Litwin* v. *Blackstone Group, L.P.* 634 F.3d 706 (2011) .......................... 16,40

*McMahan & Co. v. Wherehouse Entm't., Inc.,* 900 F.2d 576 (2d Cir. 1990)................................................................................ 44

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010)...........................*passim*

*Mills v. Polar Molecular Corp*., 12 F.3d 1170 (2d Cir. 1993) .................... 17

*Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220 (S.D.N.Y. 1999)......... 34

*N.J. Carpenters Health Fund* v. *Royal Bank of Scottland Group, Plc,* 709 F.3d 109 ..............................................................................*passim*

*Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014)..................................... 2, 17, 18

*Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114 (2d Cir. 2012).................................................................................. 18, 38

*Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Trans., Inc.*, 730 F.3d 263 (3d Cir. 2013) ............................ 23

*Police and Fire Retirement System of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) ......................................................... 23

*Reiser v. Residential Funding Corp.*, 380 F.3d 1027 (7th Cir. 2004) ......... 35

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)....................................... 22

*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008) ................... 19, 30

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774 (2d Cir. 1984)...................................................................... 18

*S.E.C. v. Gabelli*, 653 F.3d 49 (2d Cir. 2011) ........................................... 44

*Slayton v. Am. Express Co.*, 460 F.3d 215  (2d Cir. 2006) ..................... 30,31,38

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247 (2d Cir. 1973).................................................................................... 44

*Staeher v. Hartford Fin. Servs. Grp.*, 547 F.3d 406 (2d Cir. 2008) ........ 24,35

*Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2d Cir. 1999)............... 30,31

*Stratte-McClure*, 784 F. Supp. 2d 373 (S.D.N.Y. 2011) ............................ 42

*Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120  (2d Cir. 2011).............. 7

**Statutes**

15 U.S.C. § 77l(a)(2) ............................................................*passim*

15 U.S.C. § 77m...................................................................*passim*

15 U.S.C. § 77.......................................................................... 41

15 U.S.C. § 77k......................................................................... 25

15 U.S.C. § 77v ......................................................................... 8

28 U.S.C § 1331  ...................................................................... 8

**Rules**

Fed. R. Civ. Proc., Rule 8(a)....................................................... 18

Fed. R. Civ. Proc., Rule 12(b)(6)...........................................*passim*

Fed. R. Civ. Proc., Rule 15(a)....................................................... 17

Fed. R. Civ. Proc.,  Rule 15(c)...............................................*passim*

## PRELIMINARY STATEMENT

Lead Plaintiff NECA-IBEW Pension Trust Fund ("NECA-IBEW") and co-plaintiff Denis Montgomery ("Montgomery"), appeal the January 9, 2014 Final Judgment of the United States District Court for the Southern District of New York (Kaplan, J.), which was based on the District Court's December 3, 2013 one page Order upholding U.S. Magistrate Judge Henry B. Pitman's February 15, 2013 Opinion and Order denying Lead Plaintiff's motion for leave to file a Proposed Second Amended Complaint ("SAC"). Joint Appendix 2123-2169 (hereinafter "A-__"). Magistrate Pitman's Opinion was based on his conclusion that it would be futile to permit the filing of the proposed SAC because all of its claims for violations of the Securities Act of 1933 (the "1933 Act") against Bank of America Corporation, and certain of its officers, directors and securities underwriters (jointly "BAC," the "Bank," or the "Company") were time-barred pursuant to the statute of limitations for filing a complaint against BAC. (*See, e.g.*, A-2140-2142, 2145, 2148, 2151).

Magistrate Pitman's February 15, 2013 Opinion (the "2/15/2013 Opinion") was upheld by the District Court (Hon. Lewis A. Kaplan) by Order entered December 3, 2013 (A-2171) on the grounds that there was no abuse of discretion evident in the 2/15/2013 Opinion; Judgment accordingly

1

entered on the Order on January 9, 2014. (A-2172-73). One significant flaw of the District Court's ruling and Judgment is the conclusion of the 2/15/2013 Opinion of Judge Pitman that by late 2008, a reasonably diligent investor/plaintiff of ordinary intelligence would have had sufficient facts to plead a violation of the Securities Act (A-2142, 2147-48, 2151). This dispositive assertion should have been reviewed under a *de novo* review standard – something that the District Court neglected to perform. (A-2171); *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

## SUMMARY OF ARGUMENT

The District Court's denial of Lead Plaintiff's motion for leave to file the proposed SAC and its resultant dismissal of Plaintiffs' 1933 Act claims in this action, with prejudice, must be reversed because valid claims for violations of the 1933 Act were properly alleged in the proposed SAC. Further, the District Court in adopting the recommendation of the Magistrate Judge (after pending for over ten (10) months) applied an incorrect standard of review by failing to recognize that the allegations of the SAC should have "related back" to, at least, the first amended complaint ("FAC") filed by NECA-IBEW following its appointment as Lead Plaintiff under the Private Securities Litigation Reform Act ("PSLRA"). Thus, the District Court's Order and Judgment is an outright error as a matter of law. (A-2171-73).

2

Plaintiff Montgomery's original complaint alleged that in the second half of 2007 BAC failed to: (1) properly recognize certain impairments to its loans, collateral debt obligations ("CDOs"), home equity loans ("HELs"), asset-backed securities ("ABSs"), mortgage backed securities ("MBSs") and other assets; (2) maintain adequate internal financial controls to recognize and address these impaired assets; and (3) set aside adequate capital reserves to address the event of defaults and/or write downs of assets. (A-23, 44-45). The FAC and proposed SAC also similarly alleged that BAC overstated the assets of the Bank's CDOs, HELs and MBSs, but added BAC's failure to disclose facts known by senior management at the time regarding the likely financial detriment occasioned by its imminent acquisition of Countrywide Financial Corporation ("Countrywide"). (*Compare*, A-23, 44-45, *with* A-62-66, 83, 87-101, *and* A-1892-1896, 1908-1923, 1934-1949, 1951-1952).

Accordingly, BAC overstated its results of operations and then-current financial condition immediately prior to the Series H and K Offerings that are at issue herein and, as a result, was able to reap higher prices for these two Offerings ($8.925 billion) than the Bank would have otherwise been able to realize had the truth of BAC's financial condition been timely disclosed to Plaintiffs and other members of the investing public. (A-35-44).

3

Following NECA-IBEW's appointment as Lead Plaintiff (A-53), and pursuant to stipulated Order (A-54-58), a first amended complaint ("FAC") was filed. (A-59-113). The FAC imported the same core allegations of the original complaint and augmented them with greater evidence of BAC's material understatement of its loss reserves for loans (including HELs, and CDO originations). (A-59, 77-82). In addition, the FAC included new allegations regarding BAC's problematic acquisition of Countrywide (A-87-96) which was not integrated into BAC for SEC reporting purposes until January 20, 2010 when BAC released combined financial results with Countrywide for fiscal year 2009. (A-108). BAC thereafter moved to dismiss these claims under Fed.R.Civ.Proc., Rule 12(b)(6).

On February 9, 2012, Magistrate Judge Pitman issued an Opinion and Order (the "2/9/2012 Opinion") which proposed the granting of BAC's motion to dismiss the FAC. (A-1610). Following Plaintiffs' filing of a motion for leave to file a second amended complaint on March 15, 2012 (A-1707-1708), the District Court adopted the 2/9/2012 Opinion with the proviso that the Magistrate Judge should consider the proposed SAC and deny its filing should the court conclude the amendment would be "futile." (A-1796).

4

On May 18, 2012, Plaintiffs filed a revised proposed redlined SAC. (A-1886).  The redlined proposed SAC included the same core allegations of the original complaint and FAC, but augmented the earlier allegations in two material ways: (1) BAC's failure to set aside appropriate loan loss reserves and abide by its objectively-based value at-risk ("VAR") protocols by excluding all CDOs from VAR, and also failing to mark-to-market these CDO assets pursuant to Statement of Financial Accounting Standards ("SFAS") Nos. 157 and 159 beginning in the third quarter 2007 (A-1908-1923); and (2) BAC's failure to capably conduct a competent due diligence examination of Countrywide prior to BAC's January 11, 2008 publicly announced decision to acquire Countrywide, as later evidenced by the United States' Financial Crisis Inquiry Commission ("FCIC") report issued January 2011 regarding the true financial condition of Countrywide at the time of being acquired by BAC. (A-1938-1947).[1]

---

[1] The FCIC was established pursuant to the Fraud Enforcement and Recovery Act of 2009 (Pub. L. 111-21), and was tasked to "examine the causes, domestic and global, of the current financial and economic crisis in the United States."  The FCIC issued its final report in January 2011, and that portion relevant to Countrywide loan originations between 2003 to 2007 was attached to the proposed SAC. (A-1969).  The full report can be found on the FCIC website at: http:fcic.law.stanford.edu/resource/index/page :5/Search.keywords:countrywide%20/Search.Videos:1/Search.Documents:1/ Search.Interviews:1/Search.endmonth:03/Search.endyear:2012.

After briefing of Plaintiffs' motion for leave , the Magistrate Judge issued an Opinion and Order on February 15, 2013 (the "2/15/2013 Opinion") denying the filing of the proposed SAC on the grounds that the amendment was "futile."  (A-2141; see also A-2142 ("I conclude that a reasonable investor of ordinary intelligence would have had sufficient facts to plead a violation of the Securities Act by late 2008"); accord A-2145, 2148, 2151.

Plaintiffs objected to the 2/15/2013 Opinion, but to no avail, and the District Court upheld the Opinion in a one page Order.  (A-2171).  The District Court's Order held that the Opinion was "non-dispositive" thereby not warranting *de novo* review (A-2171) but the opposite was true since the denial of the motion effectively terminated the action.

The dismissal was in part based on the District Court's finding that the risk disclosures in the Prospectus rendered immaterial, as a matter of law, the systematic disregard of BAC's loan loss reserves and value-at-risk asset ("VAR") protocols used for the shelf registration statement and the prospectuses used for the Series H and K Offerings.  In fact, all of the BAC risk disclosures related to future events that "may" occur while the alleged underwriting and loan loss misstatements were about historical facts regarding how CDOs, HELs, MBSs and other loan-based assets that had

6

occurred and *were* accounted for by BAC. It is settled law in this Circuit that risk disclosures cannot foreclose the materiality of misstatements or omissions of historical fact, yet, that is precisely the conclusion reached by the District Court in affirming the 2/15/2013 Opinion. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011); *In re Bear Stearns Companies, Inc. Sec., Deriv. and ERISA Litig.*, 763 F.Supp.2d 423, 488-489 (S.D.N.Y. 2011).

The District Court also based its dismissal on Magistrate Judge Pitman's holding regarding the presence of purported well known and widely available public information in "late 2008" that placed Appellants on constructive notice for purposes of the one year statute of limitations applicable under the Securities Act. (A-2140-2142, 2145, 2148, 2151). Once again, the District Court's ruling is directly contrary to settled law which holds that general public disclosures cannot render immaterial, as a matter of law, specific misleading statements in a company's prospectus. *See, e.g., New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, Pl*c, 709 F.3d 109, 126-127 (2d Cir. 2013). This ruling was also factually wrong because both the FAC and the proposed SAC alleged that BAC went to great lengths in its public filings and statements (prior to the Series H and K Offerings) to assure investors that, despite adverse financial

7

conditions in the general market, BAC had fortified its loan loss reserve and VAR protocols.

Finally, the Magistrate Judge's determination that Plaintiffs' proposed SAC allegations regarding the Bank's failure to properly value and reserve for the risk of default on its CDO portfolio were "new accounting allegations" and thus time-barred were, again, flatly wrong. (A-2128-30, 2142, 2144). These allegations merely augment those pled in the original complaint and the FAC and should have been deemed to relate back to these earlier pleadings under Fed.R.Civ.Proc., Rule 15(c).

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v. The District Court entered its Judgment dismissing Plaintiffs' claims with prejudice for failing to state a claim under Fed. R. Civ. Proc., Rule 12(b)(6) on January 9, 2014, and Lead Plaintiff, NECA-IBEW, timely appealed on February 6, 2014. (A-2174). Appellate jurisdiction exists under 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

8

1.   Whether the District Court applied the appropriate standard of review to the 2/15/2013 Opinion in light of Plaintiffs' objections;

2.   Whether The District Court erred in upholding the 2/15/2013 Opinion concluding that Plaintiffs' allegations of BAC's accounting of CDO assets under VAR were "new" allegations that did not relate back to the allegations of the original complaint;

3.   Whether the District Court erred in dismissing the proposed SAC because its allegations were "merely conclusory" with regard to the adequacy of BAC's loan loss reserves and that asset losses misrepresented BAC's Tier 1 Capital and Leverage ratios at year-end 2007, thus failing to state a plausible Securities Act claim;

4.   Whether the District Court erred in upholding the 2/15/2013 Opinion's conclusion that Defendant Lewis' January 11, 2008 public statements made while BAC's CEO regarding the "much higher quality" and performance of Countrywide "current market" loan originations were sufficient to trigger necessary inquiry notice by a reasonable investor of BAC's substantial financial exposure in acquiring Countrywide; and

5.   Whether general press coverage regarding the unprecedented financial turmoil in 2007 - 2008, unrelated lawsuits involving BAC or

9

Countrywide, BAC's purported "general financial instability," or similar non-specific public statements in a storm of public statements of the financial industry (good and bad) place a reasonable investor on inquiry notice of fact specific nondisclosure by an issuer under the Securities Act.

I.  **STATEMENT OF THE CASE**

A.  **THE ORIGINAL COMPLAINT**

The original complaint was brought by Denis Montgomery and included express, narrow allegations regarding BAC's failure to properly disclose the impairment and improper valuation of certain CDOs, HELs, MBSs and other assets in connection with three (3) securities offerings, the Series K, L and H, to the general public.  Mr. Montgomery was a purchaser of the Series H Securities.  (A-23-24).  These three Offerings were structured utilizing the same Securities and Exchange Commission ("SEC") Form S-3 Registration Statement, as augmented by a separate prospectus supplement, all of which incorporate by reference the Company's intervening public filings.  (A-30-31).  The registration statement and prospectus for these Offerings uniformly failed to disclose that:

(a)   The Company's loans, leases, CDOs, and commercial mortgage backed securities were impaired to a far greater extent than BAC had disclosed;

(b)   BAC had misrepresented the extent of the Company's impaired assets by failing to establish adequate reserves or properly record losses for its troubled assets;

(c)   The Bank's internal controls were not as represented in that they facilitated BAC from truthfully reporting the true value of its assets; and

(d)   BAC's capital base was misrepresented in light of the significant impairment of its assets.

(A-23, 44-45).

The complaint further alleged that once these material non-disclosures came to light, BAC announced (on January 16, 2009) that it was necessary to take multi-billion write-downs in its loans, CDOs, and other securities backed by commercial mortgages, causing the price of the Series H, K and L Securities to precipitously decline.  (A-45).  Following the issuance of notice under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), NECA-IBEW came forward and successfully moved for appointment as Lead Plaintiff.  (A-53).

11

## B.    THE FIRST AMENDED COMPLAINT

Following NECA-IBEW's appointment as Lead Plaintiff, on January 18, 2011, Plaintiffs filed the FAC on behalf of the same Class pled in the original Complaint.  (A-71-73).[2]

The FAC included allegations with regard to each of the three Offerings Series H, K and L as pled in the original complaint.  *Compare*, A-22, *with* A-71-2).  Lead Plaintiff NECA-IBEW and co-plaintiff Montgomery alleged that the SEC documentation for each Offering contained the same or substantially identical untrue statements of material fact, or omitted to state other facts necessary to make the statements made therein true and non-misleading, thus rendering the documentation for each Offering at odds with applicable SEC rules and regulations, and the provisions of the federal securities laws applicable to initial public offerings ("IPOs").  (A-108-111).

The FAC also provided additional factual allegations that clarified the magnitude of BAC's overvaluation of loan assets (*e.g.*, CDOs, HELs, MBSs, *etc.*) and the Bank's taking of improper loan loss reserves given the effect of

---

[2] To avoid potential overlap with the class period asserted in the pending Multi-District Litigation proceedings in *In Re Bank of America Corp. Sec., Derivative and ERISA Litig.,* No. 09-MDL-2058 (PKC), the proposed Class includes only those who purchased BAC securities issued pursuant to the Offerings on or before September 12, 2008.

overstating the Bank's Tier 1 and Leveraging capital ratios at year end 2007. (A-95-100).

The FAC also alleged that because BAC failed to properly record CDO, HEL and MBS losses it had consequently failed to correctly report its Tier 1 capital base. (A-96-97, 99-100). If properly recorded, BAC would not have been able to assert a "well capitalized status" as it did in the Offering documents allowing BAC to proceed with Series H and K Offerings at the same pricing point. (A-100).

## 1. The Magistrate Judge's February 9, 2012 Opinion

In response to BAC's motion to dismiss, Magistrate Judge Pitman issued the "2/9/2012 Opinion" in which he recommended the dismissal of the FAC in its entirety. (A-1610).

Despite Plaintiffs' objections to the 2/9/2012 Opinion, the District Court adopted its finding, but directed the Magistrate Judge to consider the *bona fides* of Plaintiffs' recently filed motion for leave to file a proposed second amended complaint (A-1707) unless the Magistrate Judge concluded "that the proposed amendment would be futile." (A-1796).

13

## C.      THE SECOND AMENDED COMPLAINT

On March 15, 2012, Plaintiffs filed their motion for leave to file a proposed SAC. (A-1707). A redlined version of the SAC was submitted to the court on May 18, 2012, and included significant modifications of the FAC along with augmented factual allegations regarding BAC not disclosing accounting practices that allowed the misreporting of CDO, HEL, MBS and other loan write downs and inadequate loan loss reserves to occur at the time of the Offerings. (A-1886).

Specifically, the Complaint states that BAC had removed its entire CDO portfolio and CDO-related assets from the scrutiny of the Bank's VAR model (an accounting tool to "measure and manage" financial assets) to escape the necessity of marking-to-market these assets under generally accepted accounting principles ("GAAP") and SFAS 159 from at least the beginning of the third quarter 2007 and continuing through the balance of that year. (A-1892-1896, 1915-1923).[3]   As a result, the Bank misstated its Tier 1 capital and leverage ratios for year end 2007 and that BAC enjoyed a

---

[3] The SAC further details and alleges that the Company failed to disclose, prior to the January 2008 preferred stock offerings, the removal of all CDOs from the Bank's VAR model results in the Company's 3Q '07 Form 10-Q, or its 4Q '07 "Supplemental Information – Fourth Quarter" Form 8-K filing. (A-1915-1917). Instead, this disclosure only occurred in BAC's 2007 Form 10-k issued February 28, 2008, approximately a month after the Series K and L Offerings. (A-1920-1921).

14

"well capitalized" FDIC bank rating when, in fact, it was at best "adequately capitalized." (A-1915-1923).

The SAC also included additional factual allegations – based on a report from the FCIC – establishing that then BAC CEO Lewis did not have a reasonable basis to believe his January 11, 2008 public statements regard the quality or performance of "current market" loan origination conducted by Countrywide. (A-1939-1940, 1945-1947).

Following briefing on Plaintiffs' motion for leave to amend, on February 15, 2013, the Magistrate Judge issued an Opinion and Order recommending the denial of the motion solely on the ground that such an amendment would be futile because of the statute of limitations. (A-2123, 2132). In reaching this determination, the Magistrate Judge concluded that general public disclosures in other lawsuits, regulatory filings involving BAC and Countrywide, general press coverage, "the unprecedented financial turmoil in 2007-2008," BAC's "general financial instability" and the "general market turmoil, would have caused a reasonably diligent investor of ordinary intelligence by "late 2008" to discern the truth about BAC's impaired assets, inadequate asset write downs and thereby realize the falsity of Lewis' January 11, 2008 statement regard the higher quality and

performance of Countrywide's "current market" loan originations.  (A-2140, 2145, 2148, 2150-2151).[4]

Pursuant to a one page Order entered December 3, 2013, the District Court (without any analysis) adopted the Magistrate Judge's 2/15/2013 Opinion (A-2171), and Judgment was thereafter entered against Plaintiffs. (A-2172).

## II.   STANDARD OF REVIEW

Magistrate Judge Pitman's 2/15/2013 Opinion was based on the perceived "futility" of the proposed SAC.  (A-2140-41, 2168).  Indeed, the District Court noted as much in its one page Order denying *de novo* review of the Opinion stating that it was a "non-dispositive motion[] … subject to review for errors of law or clear errors of fact."   (A-2171).

However, this Circuit had previously (and repeatedly) held that the "futility" of a proposed amended pleading "is a determination, as a matter of law," requiring *de novo* review.   *Panther Partners Inc. v. Ikanos*

---

[4] As confirmed in *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, Plc*, 709 F.3d 109, 126-127 (2d Cir. 2013) ("While the 'total mix' of information relevant to the question of materiality can include publicly available information, 'case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information" (*citing, Litwin v. Blackstone Group, L.P.* 634 F.3d 706, 718 (2d Cir. 2011)).

16

*Communications, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012); *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (When the denial of leave to amend is based on … a determination that amendment would be futile, a reviewing court conducts a *de novo* review") (emphasis in original). Accordingly, the standard of review of the Judgment, its underlying Order, and the 2/15/2013 Opinion should have been *de novo* review. *Id.*

III. **ARGUMENT**

    **A.**    **LEGAL STANDARDS ON SEEKING LEAVE TO AMEND**

A motion to amend is governed by Fed. R .Civ. Proc., Rule 15(a), which provides that leave to amend should be freely granted when justice so requires. Fed. R. Civ. Proc., Rule 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Facts taken from a proposed amended complaint for purposes of assessing amendment "futility" are to be accepted as true, and viewed through the lens of whether they are sufficient as a matter of law. *E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 282 (S.D.N.Y. 2006) (*citing*, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993)). A proposed amendment is futile only "where the claim or defense proposed to be added has no colorable merit." *Oliver v. DeMarinis & Co.*, Civil No. 90-cv-7950 (SS), 1993 WL 33421, at *2 (S.D.N.Y. Jan. 29, 1993)

17

(quotations omitted); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 783 (2d Cir. 1984) (if the movant has "colorable grounds for relief," justice requires that leave to amend be granted in the absence of undue delay, bad faith, or prejudice).[5]  For that reason, the denial of a motion to amend on grounds of futility is reviewed *de novo*.  *Panther Partners*, *supra* 681 F.3d at 119; *Nielsen*, *supra*, 746 F.3d at 62 (when reviewing a denial of a motion for leave to amend on grounds of futility, "a reviewing court conducts a *de novo* review.").

Moreover, claims under the 1933 Act are governed by the notice pleading standard of Fed. R. Civ. Proc., Rule 8(a), which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. Proc., Rule 8(a); *In re Initial Pub. Offering Sec. Litig.*, 358 F.Supp.2d 189, 206 (S.D.N.Y. 2004).  Because fraud is not an element of § 11 and 12 claims, ordinary notice-pleading principles apply, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.Proc., Rule 8(a)(2).  This statement need only

---

[5] The "'colorable grounds' requirement mandates that a district court may not deny a motion for leave to amend a pleading [on futility grounds] when said pleading is sufficient to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Children First Found. Inc. v. Martinez*, No. 04 Civ. 0927 (NPM), 2007 WL 4618524 at *5 (N.D.N.Y. Dec. 27, 2007).

"give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting, Twombly,* 550 U.S. at 570); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (*quoting, Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008)).

In other words, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.[6] However, the "plausibility" standard espoused in Ashcroft is not akin to a "probability requirement;" instead, it asks only for more than a "sheer

---

[6] Moreover, "[t]he Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period." *Freudenberg v. E*Trade Financial Corp.*, 712 F.Supp.2d 171, 183-184 (S.D.N.Y. 2010) (*citing, Lapin v. Goldman Sachs Group, Inc.,* 506 F.Supp.2d 221, 237 (S.D.N.Y. 2006) (internal quotation marks and citations omitted)); *In re Vivendi Universal, S.A. Sec. Litig.,* 381 F.Supp.2d 158, 181 (S.D.N.Y. 2003) (post-class period articles can be used to establish awareness of falsity of class period statements; the opposite result would reward defendant for successful concealment).  Here, the FCIC's January 2011 report amply evidenced that Lewis had no reasonable basis to extol the quality of Countrywide's "current market" loan originations as being of "much higher quality and better spreads."  (A-1945-1946).

19

possibility" that the culpable defendants acted unlawfully. *Ashcroft*, *supra*, 556 U.S. at 678.

In ruling on a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded factual allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*citing, Twombly*, *supra*, 550 U.S. at 555). As the Second Circuit recently explained, "courts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct." *N.J. Carpenters Health Fund*, *supra*, 709 F.3d at 121. The application of this "plausibility" standard to particular cases is "'context-specific,'" *id.*, at p. 123 n.7 (*quoting, Iqbal*, 556 U.S. at 679), and requires assessing "the allegations of the complaint as a whole," *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1323, (2011). All reasonable inferences are drawn in the plaintiff's favor. *Beauchamp v. Financial Recovery Services, Inc.*, No. 10-cv-4864, 2011 WL 891320, at *1 (S.D.N.Y. Mar. 14, 2011).

The 1933 Act was designed "to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). To state a claim for violation of §11 of the 1933 Act, plaintiffs must allege the registration statement: (1) "contain[ed] an 'untrue statement of a material fact;'" (2) "omit[ed] to state

20

a material fact required to be stated therein;" or, (3) omitted to state a material fact "necessary to make the statements therein not misleading." *In re WorldCom Sec. Litig.*, 496 F.3d 245, 248-49 (2d Cir. 2007) (*quoting* 15 U.S.C. § 77k(a)); *see also In re Fuwei Films Sec. Litig.*, 634 F.Supp.2d 419, 440 (S.D.N.Y. 2009) ("A prospectus will violate federal securities laws if it does not disclose *'material objective factual matters,' or buries those matters beneath other information, or treats them cavalierly*") (emphasis added); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 407-08 (S.D.N.Y. 2003) (finding it sufficient for purpose of pleading a 1933 Act §11 claim for plaintiff to allege that "material facts have been omitted from a registration statement or '*presented in such a way as to obscure or distort their significance*'") (citation omitted; emphasis added). Section 11 of the 1933 Act imposes "virtually absolute liability" where a registration statement (or any part thereof) used for a public offering contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k; *In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 359 (2d Cir. 2010) (quotation omitted).

As the above standards direct, a 1933 Act claim involving §§ 11 and 12(a)(2) does not require a plaintiff to allege scienter, reliance, or other

21

elements of fraud. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). Instead, "Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact." *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 201 (E.D.N.Y. 2000) (citation omitted); *Iowa Pub. Emps'. Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 141 (2d Cir. 2010) ("To prevail on a § 11 or § 12(a)(2) claim, a plaintiff must show that the relevant communication either misstated or omitted a material fact.").[7]

### B. THE DISTRICT COURT ERRED IN SUSTAINING MAGISTRATE JUDGE PITMAN'S OPINION CONCERNING THE RUNNING OF THE STATUTE OF LIMITATIONS

Magistrate Judge Pitman incorrectly concluded in his 2/15/2013 Opinion that each of Plaintiffs' claims arising from BAC's improper accounting and loan loss reserve practices represented claims time-barred. (A-2143-44, 2147-49, 2151). Section 11 and 12(a)(2) claims under the Securities are subject to a one-year statute-of-limitations period that

---

[7] Section 12(a)(2) liability parallels the §11 standard for "any person who offers or sells securities by means of a prospectus containing material misstatements." *In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 386 (S.D.N.Y. 2007).

22

commences upon "the discovery of the untrue statement or the omission, *or* after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. In addition, Sections 11 and 12 claims are also subject to an absolute three-year limitations period, commonly referred to as Section 13's statute of repose. *Police and Fire Retirement System of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 109, 110 (2d Cir. 2013).

Here, notwithstanding the surmise of the Court, the facts necessary to put Plaintiffs' on inquiry notice were not available earlier than January 16, 2009, at the earliest, rather than the vague opinion pointing to sometime in the "late 2008" time frame opined by Magistrate Judge Pitman. (A-2147-48, 2151). *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 652-653 (2010) holding that the "discovery" of facts sufficient to put a plaintiff on "inquiry notice" *does not* automatically start the running of the limitations period (collecting cases, including *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)). That standard was adopted by the Second Circuit Court of Appeals in *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011); *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Trans., Inc.*, 730 F.3d 263, 274-275 (3d Cir. 2013) (concluding that the reasoning behind *Merck* equally

23

applies to claims brought under the 1933 Act, *citing*, *City of Pontiac*, 637 F.3d at 174-175).[8]

We respectfully suggest that Judge Pitman misapplied this Court's opinion in *City of Pontiac*, *supra*, to erroneously conclude that inquiry notice *alone* based on <u>generalized</u> "storm warnings" commences the running of the statute of limitations in 1933 Act cases. *NECA-IBEW*, 2013 WL 620257, at *5-6, *citing*, *Freidus v. ING Group N.N.*, 736 F. Supp.2d 816, 816 (S.D.N.Y.

---

[8] This standard has since been applied to Securities Act §§ 11 and 12(a)(2) claims by numerous New York district courts. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, *supra*, 753 F.Supp.2d at 371 n.39 (Sullivan, J.) (the "discovery" rule enunciated in *City of Pontiac* encompasses claims under the Securities Act); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, No. 08-cv-5093, 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011) (Baer, J) (same); *Brecher v. Citigroup Inc.*, no. 09-cv-7359, 2011 WL 5525353, at *4 n.1 (S.D.N.Y. Nov. 14, 2011) (Stein, J.) (the statute of limitations under the Securities Exchange Act of 1934 is consistent with that under the Securities Act, thus warranting application of the new discovery rule announced in *Merck*/*City of Pontiac*); *Plumbers' & Pipefitters' Local # 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I*, No. 08-cv-1713, 2012 WL 601448, at *10-11, n.11 (E.D.N.Y. Feb. 23, 2012) (Korman, J.) (applying *Merck*/*City of Pontiac* to Securities Act §§ 11 and 12(a)(2) claims, finding no material difference in applicable statute of limitations between the two securities acts); *In re Direxion Shares ETF Trust*, No. 09-cv-80911, 2012 WL 717967, at *2 n.3 (S.D.N.Y. Mar. 6, 2012) (Forrest, J.) (same); *see also In re Bear Stearns Mortgage Pass-Through Cert. Litig.*, No. 08-cv-8093, 2012 WL 1076216, at *12-13 (S.D.N.Y. Mar. 30, 2012) (Swain, J.) ("Plaintiffs cannot be charged with knowledge of every lawsuit filed against an [MBS] originator"), *citing, Staeher v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 418 (2d Cir. 2008).

24

2010). This expansive formulation of inquiry notice was emphatically rejected in *Merck*, *supra*.

Rather, as the Supreme Court explained, "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating," but still "*the limitations period does not begin to run until* the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered '*the facts constituting the violation." Merck*, 559 U.S. at 653 (emphasis added) ("If the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered….[the] 'facts constituting the violation.'"). *Id.*, at 651.

Against this clear direction, Magistrate Judge Pitman concluded that applying the more permissive *Merck* standard still allows the claims alleged in the proposed SAC to be time-barred because "late-2008" "storm warnings" and other generalized public information surrounding the unprecedented financial crisis should have triggered a depth of analysis resulting in knowledge of wrongdoing that was alleged in the complaint. *NECA-IBEW*, 2013 WL 620257, at *8-9, 11. This conclusion is incorrect, and the District Court's rubber stamp approval of the 2/15/2013 Opinion

25

without a shred of analysis of this key issue, requires reversal of the Judgment.

The facts necessary to plead Plaintiffs' 1933 Act claims relating to deficient loan (*i.e.*, CDO, HEL and MBS) loss reserves and violations of BAC's VAR protocols (and their corresponding effect on Tier 1 capital and leverage ratios) did not arise until January 16, 2009, when BAC released its full year 2008 financials that first included disclosure of CDO and related write-downs. So called "general market turmoil" in late-2008 never provided specific factual details as to BAC necessary for a reasonable investor to be alerted to the SAC's alleged Securities Act violations given Lewis' positive January 11, 2008 Countrywide statement, particularly since the actual results of the combined operations of BAC/Countrywide were not released until January 20, 2011. (A-1961).[9] *New Jersey Carpenters*, *supra*, 709 F.3d at 126-127.

Thus, at best, the Magistrate Judge's "late 2008" surmise that "generalized" public information provided adequate "inquiry notice" to BAC purchasers of Series H, K, and L securities prior to BAC's specific

---

[9] This is particularly true since the FCIC report – that directly belies Lewis' January 11, 2008 public statement regarding Countrywide's "higher quality ... current market" loan originations – was not released until January 2011. (A-1945-1947).

26

public disclosure of these issues on January 16, 2009, is an inconclusive, and highly suggestive, factual surmise subject to dispute on the facts and, *ergo*, the merits.

### 1. The SAC's Improper Accounting Claims Were Not Time-Barred

Relative to Plaintiffs' allegations of improper accounting constituting 1933 Act violations, the "facts" that were purportedly publicly available to Plaintiffs for "discovery" purposes commencing the running of the statute of limitations never reached a level of application under the *Merck*/*City of Pontiac* threshold until January 16, 2009, when BAC issued a press release reporting fourth quarter and full year 2008 financial results that included acknowledgement of massive write-downs as were alleged by the proposed SAC. (1896, 1960-61); *Merck.*, 559 U.S. at 653-644. Plaintiff Montgomery's original complaint was filed within one year of the BAC press release. (A-21). As a result, the Magistrate's Judge's Opinion's repeated assertion that this information must have been known to any reasonable investor by no later than "late 2008" – notwithstanding <u>no</u> evidentiary citation by the court supporting this proposition – is not entitled to the "broad discretion" review standard claimed by the Magistrate Judge (A-2135) as subsequently adopted by the District Court. (A-2171).

27

Moreover, the 2/15/2013 Opinion fails to consider the proposed SAC's allegations that alterations to BAC's VAR resulted in the removal of the Bank's $26.2 billion portfolio of CDOs from the requirement of having contents marked-to-market. This, in turn, allowed BAC to *defer* recognition of an additional $5.5 billion in CDO/HEL/MBS write downs that would have been appropriate at year-end 2007, and caused BAC to not publicly disclose the consequence of its CDO/HEL/MBS asset classification in its calculation of Tier 1 capital ratios at year-end 2007. If it had properly been recognized, the resulting metrics would have required BAC's "well capitalized" FDIC bank rating to be adjusted and downgraded to "adequately capitalized." This would have negatively affected the pricing of the Series H, K and L Offerings. (A-1915-1923).

The initial complaint (and/or the FAC) had specifically alleged that, *inter alia*,

- The Company's loans, leases, CDOs, and mortgage backed securities on its books were impaired to a greater extent than disclosed;

- Defendants misrepresented the extent of the Company's impaired assets by failing to adequately reserve or properly record known losses for impaired assets;

28

- BAC's internal controls (such as VAR) were inadequate to prevent the Company from improperly reporting its impaired assets;

- The Company's capital base was not as represented in light of the impairment of assets.

(A-23, 44, 102-103).

The presence of these key allegations, in the original complaint, combined with the subsequent augmentation of the same by the additional allegations pled in the FAC and proposed SAC should have, as a matter of law, related back to the original complaint. *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) ("the standard for determining whether a claim should relate back under Rule 15(c) is well established"). Rule 15(c) provides that an amended pleading will relate back to the date of filing of a prior pleading where claims asserted in the new pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.Proc., Rule 15(c). "The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) *citing*, *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir.1983).

29

The relation back doctrine should be applied liberally when the case involves a cause of action which, by its nature, as is the case here, is difficult to prove without the aid of rudimentary discovery. *See In re Everfresh Beverages, Inc.,* 238 B.R. 558, 574 (Bankr. S.D.N.Y. 1999) *citing*, *In re Chaus Sec. Litig., supra*; *Tabacalera Cubana, S.A. v. Faber, Coe & Gregg, Inc.,* 379 F.Supp. 772 (S.D.N.Y. 1974).

Consequently, "[t]he doctrine of relation back applies when an amendment adds a new theory of recovery based on the same transaction or occurrence as originally pleaded." *Holdridge v. Heyer-Schulte Corp. of Santa Barbara*, 440 F. Supp. 1088, 1093 (N.D.N.Y. 1977). The doctrine also applies when a complaint is amended to "correct specific factual details or to make more specific what has already been alleged." *Id.*; *Slayton*, 460 F.3d at 228 ("Where the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs."); *see also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999). Indeed, "[t]he Second Circuit has held that where 'no new cause of action is alleged ... this Court liberally grants relation back under Rule 15(c).'" *Perkins v. Southern New England Tel. Co.*, 3:07-cv-00967, 2009 WL 3754097, at * (D. Conn. Nov. 4, 2009) *citing*, *Stevelman*, 174 F.3d 79.

30

"The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 150 n. 3 (1984); *See also Slayton*, 460 F.3d at 228 ("Under Rule 15, the 'central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading.'")

Given the above, it is unsurprising that courts often find an amendment to the pleadings relates back to the initial complaint when the amended pleading puts the defendant on notice of what must be defended against. *Baldwin County*, 466 U.S. at 150 n. 3; *Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 216 (S.D.N.Y. 2003) ("Relation back is liberally allowed, and the test is whether the facts alleged in the original complaint give sufficient notice of the conduct and transactions underlying the amendment to avoid unfair and prejudicial surprise to the defendant.") "As courts have found, 'adequate notice' not of the particulars but of the 'general fact situation' is all that is required." *In re Allou Distributors, Inc*., 379 B.R. 5, 27 (Bankr. E.D.N.Y. 2007) *citing*, *Contemporary Mission, Inc. v. New York Times Co*., 665 F.Supp. 248, 255-6

31

(S.D.N.Y.1987), *aff'd*, 842 F.2d 612 (2d Cir.1988), *cert. denied*, 488 U.S.
856 (1988).

Here, Plaintiffs' proposed SAC arose out of the "same transaction or
occurrence" as the original pleading and FAC. Indeed, Plaintiffs only
supplemented their FAC pleading with additional specific facts that were
later discovered (such as the FCIC report). (A-1945-1946). However, even
if BAC is unable to properly make the connection between the facts plead in
the original and FAC and proposed SAC, the Bank should have known that
"[w]hen a suit is filed in federal court, the defendant knows that the whole
transaction described in it will be fully scrutinized by amendment if
necessary. It knows that discovery will follow, and that leave to amend will
be freely granted. Thus defendant should have anticipated [the new
challenges]." *Sommer v. PMEC Associates & Co. Ltd.*, 88-cv-2537, 1993
WL 361660 (S.D.N.Y. Sept. 14, 1993) *citing*, *Contemporary Mission*, 665
F.Supp. at 256.

Thus, BAC enjoyed ample prior notice of the basis of the allegations
contained in Plaintiffs' proposed SAC and the relation back doctrine would
prevent the application of the statute of limitations in the manner applied by
Magistrate Judge Pitman. *Sommer*, *supra*.

### 2. The SAC's Countrywide Related Claims are Not Time-Barred

The Magistrate Judge's conclusion that the pendency of a smattering of litigation against Countrywide in 2007-2008 would have placed BAC investors on inquiry notice of the defects in the Company's Offering Documents and, more specifically, by Lewis' January 11, 2008 "good news statement" advocating that Countrywide's loan "originations in the current market are of much higher quality and better spreads than the past couple of years" were non-actionable is inconsistent. (A-1939-40, 2150-51, 2165-66). No basis existed to speculate about whether pending litigation in 2007 would have motivated additional investigations by a reasonable BAC investor given the Company's January 11, 2008 positive public statement that affirmed that Countrywide's problems were manageable following BAC's "extensive due diligence" of Countrywide that included non-public loan origination data (solely possessed by BAC). *New Jersey Carpenters Health Fund*, *supra*, 709 F.3d at 126-127.

Similarly, no reasonably diligent BAC investor could have discovered the facts constituting the violation alleged in the proposed SAC given Lewis'

33

positive statements regarding Countrywide. *Merck.*, 559 U.S. at 650-53.[10]

Indeed, given the SAC's allegations relating to Countrywide's mortgage originations (which had been publicly exposed for the first time in the FCIC Report released on January 11, 2011 (A-1879-80)), the 2/15/2013 Opinion highlights, at best, a difference of opinion at the pleading stage regarding exactly *what* was being disclosed in "late 2008" relative to the financial crisis and pending lawsuits against Countrywide. The difference of opinion extends to *what* Lewis' statement that "orientations in the current market are of much higher quality and better spreads than the past couple of years" would have meant when stated to alleviate the concern of a reasonable BAC shareholder.[11] None of the 2007 filed lawsuits against Countrywide cited in

---

[10] The 2/15/2013 Opinion expressly acknowledges that Plaintiffs' Countrywide related claims were asserted in the FAC which was filed within Section 13's statute of repose period. *NECA-IBEW*, 2013 WL 620257, at *9. Since the SAC's additional Countywide facts and allegations support the FAC's similar allegations, Plaintiffs' Countrywide claims are thus within the three-year statute of repose of (15 U.S.C. § 77m) and should have been related back to the time of the FAC's filing.

[11] Typically, disclosures into the public realm do not trigger the commencement of the statute of limitations under 77 U.S.C. § 77m if accompanied by "'reliable words of comfort from management" such that an investor of ordinary intelligence would reasonably have relied on the statements to allay his or her concern.'" *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 276 (S.D.N.Y. 2010); *accord In re Alcatel Sec Litig.* 382 F.Supp.2d 513, 527 (S.D.N.Y. 2005) (same) (*citing*, *LC Capital Partners, L.P. v. Frontier Ins. Grp., Inc.*, 318 F. 3d 148, 155 (2d Cir. 2003)); *Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 229 (S.D.N.Y. 1999) ("courts have

34

the Opinion challenged Defendant Lewis' January 11, 2008 statement. *NECA-IBEW*, 2012 WL 620257, at *10, n.9. Under these circumstances, the Magistrate Judge's and District Court judge's ruling on the statute of limitations as a matter of law was ill-advised. *See, e.g.*, *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 104 (2d Cir. 2003) (statute-of limitations factual disputes should not be resolved in defendant's favor on a motion to dismiss); *accord Staeher v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) ("because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)").

---

been reluctant to find that public disclosures" triggered limitations period "where those disclosures were tempered with positive statements").

## C. THE PROPOSED SAC STATED A VIABLE SECURITES ACT CLAIM

### 1. The 2/15/2013 Opinion Incorrectly Concluded That Material Misrepresentations Or Omissions Concerning Accounting Violations And BAC's Tier 1 Capital Base Are Non-Actionable.

The SAC alleged that BAC's failure to post sufficient reserves and take charge-offs against its CDOs, HELs, MBSs, and loan portfolios in the second, third and fourth quarters of 2007 caused BAC's Offerings to Plaintiffs and the putative class to believe that BAC was "well capitalized" (as defined by the FDIC at year end 2007) when in fact this was not so. The stated misrepresentations and omissions support the reasonable inference that BAC negligently failed to properly value (and reserve for) *then-existing* impaired CDOs, HELs, MBSs, and loan losses, causing the Company to inaccurately report its Tier 1 capital as of year-end 2007 –scant weeks before the Series K and L Offerings. The Magistrate Judge's conclusion that these were "new" accounting allegations for purposes of Fed.R.Civ.Proc., Rule 15(c), overlooked the nature of the original complaint's allegations.

As alleged in the original pleading, BAC's loans, CDOs, HELS and MBSs were alleged to have been impaired to a greater extent than had been publicly disclosed, and BAC misrepresented this objective fact. (A-23, 44-45). The original complaint also alleged that BAC misrepresented the

36

necessary and proper loan loss reserves and write downs for these financial instruments and hid the fact that the Bank's "internal financial controls" were inadequate to account for impaired financial assets which, in turn, caused BAC to overstate its Tier 1 capital base and thereby encouraged the Bank's Series K and L Offerings. *Id.*

When BAC eventually disclosed the combined financial results of BAC and Countrywide in late January 2010, Plaintiffs added additional material facts to the complaint that augmented and clarified those previously alleged in the FAC, including the materiality of BAC's reclassification of assets to avoid additional write downs and loan loss reserves, as well as the concomitant effect of reducing the Bank's Tier 1 capital ratio. This would reduce BAC to being rated only as "adequately capitalized" just a few short days before the Series K and L Offerings. The SAC's other allegations of BAC's failure to adequately write off and or reserve for loan losses, as well as BAC's disregard of its VAR tracking protocols, all stem from the original complaint's allegations regarding: (1) nondisclosure of impaired assets; (2) failure to establish appropriate reserves/record losses for such assets; and (3) misrepresenting the actual function of previously touted internal financial controls (such as VAR) for these same assets. (A-23, 44). Thus, nothing introduced as being "new" (as proclaimed by the Magistrate Judge) in the

accounting and financial reporting claims pled in the SAC would subvert Fed.R.Civ.Proc., Rule 15(c), therefore allowing the SAC's claims to "relate back" to the filing of the original complaint or FAC. *See*, *e.g.*, *Slayton v. Am. Exp. Co.*, *supra*, 460 F.3d at 228 ("Where the amended complaint does not allege a new claim but *renders prior allegations more definite and precise, relation back occurs*") (emphasis added).

As a result, the one page District Court Order confirming the 2/15/2013 Opinion covering this issue, without *de novo* review, was in error. (A-2171); *Panther Partners*, *supra*, 681 F.3d at 119) (denial of motion for leave to amend on grounds of futility requires *de novo* review). The alleged failure to report accurate financial results, timely write-down impaired assets, and improperly report BAC's Tier 1 capital ratios at the time of the Offerings, are not non-actionable statements of *opinion* as they are based on the reporting of <u>historical facts</u> derivative of the original pleading. *See*, *e.g.*, *Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, Civil No. 99-cv-12003 (LMM), 2002 WL 31387269, at *3 (S.D.N.Y. Oct. 23, 2002)

Much the same, BAC's calculations of its loan loss reserves and Tier 1 capital ratios at year-end 2007 shortly before the January 2008 Series K and L Offerings were not based on objective opinion but, rather, were subjective "gerrymandering" of BAC financial results. *See In re CitiGroup*

*Inc. Bond Litigation*, 723 F.Supp.2d 568, 592 (S.D.N.Y. 2010) (finding that claims pled under § 11 were plausible an investor was materially mislead about the Company's financial condition where defendants' reserves were calculated based solely on defaulted assets instead of also accounting for assets reasonably likely to default in the future, because loss reserves are meant to reflect not only losses already incurred but those likely to accrue).

     2.    BAC's Positive Public Statement About Countrywide's "Current Market" Loan Originations Are Actionable

Following the issuance of the 2/9/2012 Opinion, Lead Plaintiff submitted the proposed SAC identifying several additional actionable statements by Lewis concerning the Countrywide due diligence and then-existing loan originations, bolstered by post-lawsuit information concerning Countrywide loan origination data practices released by the FCIC:

> The good news is much of the originations in the current market are of much higher quality and better spreads than the past couple of years. Last, the secondary markets remain fragile and worth keeping an eye on but many spreads have been improving.

(A-1940).

In accordance with the 2/9/2012 Opinion, the SAC provided additional specific allegations supporting the claim that Lewis' "good news" statement was, in actuality, false or misleading, and not believed by BAC or

39

Lewis when publicly stated given BAC's pre-acquisition due diligence. (A-1943-47, 1969); *accord Fait*, *supra*, 655 F.3d at 110.

Specifically, Countrywide loan origination data provided to the FCIC by BAC (and first made public in February 2011) but previously known (internally) to BAC due to its late 2007 Countrywide due diligence, reveals that company-wide loan originations had not materially improved as publicly represented by the Lewis' "good news" statement in early January, 2008. (A-1939-40, 1943-47, 1969, 2150-51, 2165-66).[12] This statement, which BAC does not contest was, in fact, made by Lewis without an honest

---

[12] It is often not that a defendant may utter a false oral statement giving rise to a violation under 15 U.S.C. § 77l(a)(2), but then turn around, and claim that the "total mix" of information within the public realm effectively imparted this same information to all reasonable investors. *Litwin*, *supra*, 634 F.3d at 716-717. Here Magistrate Judge Pitman concluded in his 2/9/2012 Opinion that this statement by Lewis was "potentially actionable" (A-1674-75), but later concluded upon weighing the *bona fides* of the proposed SAC that any "comfort" occasioned by Lewis' statement "would have quickly dissipated amid the increasingly catastrophic financial climate of 2008, and would have certainly been gone well before January 16, 2009." (A-2151). However, nowhere in Judge Pitman's Opinion does the court cite to any evidence that the purported "catastrophic financial climate" was caused by or systemic to BAC. *See, e.g.*, *Merck*, *supra*, 559 U.S. at 652-653 (general "storm warnings" are insufficient to place a reasonable investor on inquiry notice for purposes of the commencement of the statute of limitations).

belief in its truth, as an affirmative misrepresentation of then-existing fact.[13]

(A-1940, 1945-1947). *Sawant v. Ramsey*, Civil No. 07-cv-980 (VLB), 2012

WL 3265020, at *6 (D. Conn. Aug. 9, 2012) (explaining that unlike the

statements held to be statements of opinion in *Fait,* the statements at issue

were statements of present fact as opposed to opinion).

Exhibit A to the SAC (the FCIC Report; A-1969) details non-public data

known to BAC at the time of Lewis' public statements and later provided to

the FCIC <u>by BAC</u> regarding Countrywide's quarter by quarter loan

originations from 2003-2007.  This date reveals, *inter alia*:

---

[13] The Magistrate Judge also incorrectly concluded that Lewis' generalized statement regarding Countrywide's operations was made "in the context of BAC's November 2007 financial disclosures that provided: (1) its provisions for credit losses had increased; (2) its net charge-offs had increased; (3) the relevant financial markets were experiencing extreme dislocations, and further, BAC predicted continuing adverse impacts on its future financial performance as a result of those dislocations; (4) it had CDO and loan exposure, including subprime exposure and (5) its allowance for loan and lease losses had increased."  (A-1680).  And, that even if the statement was false, the context in which it was disseminated neutralized its potential to be misleading and actionable under the 1933 Act.  *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, 2013 WL 620257, at *17 (S.D.N.Y. 2011).  However, Lewis' statement regarding Countrywide's operations was not made in the context of BAC's financial disclosures.  Rather, the statement was made during the Countrywide due diligence review announced on January 11, 2008, and was a specific statement of then-existing fact about Countrywide's loan originations and the assets BAC was acquiring.

- Countrywide loan originations were substantially similar throughout 2007 to those in prior years and, in certain instances, were worse in the fourth quarter of 2007;

- FICO scores on Countrywide originations in 2007 were similar to those in 2004-2006: ranging from a weighted average FICO score of 705 (in the first quarter of 2004), to a weighted average score of 703 (in the first quarter 2007), and 706 (in the second and third quarters of 2007), to 712 (in the fourth quarter 2007);[14]

- Combined loan-to-value ratios ("CLTV") for Countrywide originations in the fourth quarter of 2007 were substantially similar to years 2004-2006. The weighted average CLTV on all Countrywide originations in the fourth quarter 2007 was 79% (and 79-80% in the first through third quarters of 2007), while the CLTV for Countrywide originations for years 2004-2006 were virtually identical, having CLTV weighted averages of 79-81%;

---

[14] The passing reference in the Report of two Countrywide loan products, Alt-A and Pay-Option loans, originated between the third and fourth quarter 2007, hardly validates Lewis' statement that originations in the "past couple of years" were of a much higher quality, as a matter of law. *Stratte-McClure*, 784 F.Supp.2d 373, 388 (S.D.N.Y. 2011) (factual dispute over interpretation of historical trading data cannot be resolved on a motion to dismiss); *In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 235 n.5 (S.D.N.Y. 2010) (same).

- Countrywide originations in the fourth quarter 2007 with a CLTV greater than 85%, 90% and 100%, comprised approximately 43% of all originations in that quarter. In comparison, the same CLTVs in the fourth quarters 2005 and 2006 comprised, roughly, 44% of all originations in those quarters; and,

- Countrywide originations in the fourth quarter 2007 with greater than 100% CLTV increased by approximately 40% from the fourth quarter 2005, and approximately 28% from the fourth quarter 2006.

(A-1969).

The Magistrate Judge's acceptance of BAC's interpretation of the FCIC data is not to the contrary. At best, it shows that by January 11, 2008 the number of originations for two limited and discrete types of Countrywide loans (Alt-A and Pay-Option loans), like all other Countrywide loan types, had decreased. But that fails to validate Lewis' representation that current originations were of "higher quality" than their predecessors, and the FCIC data appended to the SAC reflects that Countrywide's loan originations had, in fact, not qualitatively changed from earlier reported periods; they had only quantitatively decreased. *NECA-IBEW*, 2013 WL 620257, at *16-17.

Moreover, the 2/15/2013 Opinion does not consider the proposed SAC's allegations of the material misrepresentations, omissions and/or half-truth of the statement because by the time of the acquisition announcement, Countrywide was no longer able to issue loans pursuant to its prior origination and underwriting practices. The 2/15/2013 Opinion also does not consider allegations that BAC failed to disclose the substantial problems and risks associated with the 2003-2006 loan originations, securitization practices and toxic 2006 sub-prime loan vintages. (A-1943-1947).

An omission is actionable when the failure to disclose the information renders a statement misleading. *S.E.C. v. Gabelli,* 653 F.3d 49, 57 (2d Cir. 2011) ("[S]o-called 'half-truths' - literally true statements that create a materially misleading impression - will support claims for securities fraud."); *see also Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247, 249 (2d Cir. 1973) ("The[securities] laws are founded on the principle that full and fair disclosure of all material facts must be made to investors so that they may have the benefit of the facts in making their investment decisions."); *McMahan & Co. v. Wherehouse Entm't., Inc.,* 900 F.2d 576, 579 (2d Cir. 1990) ("[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which

mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *Fogarazzo v. Lehman Bros.,* 341 F.Supp.2d 274, 294 (S.D.N.Y. 2004) (technically accurate statement can be actionable when material omissions render the statement a "half-truth.").

The proposed SAC alleged specifically and with great detail that BAC did not provide, at the time of the Offerings, an accurate picture of the known existing problems at Countrywide, its loan origination quality, the associated financial risk and exposure being assumed by BAC and the deserved disbelief of Lewis' January 11, 2008 statements, spoken as an affirmative representation of then-existing fact. Magistrate Judge Pitman's Opinion and the District Court's ensuing Order and Judgment with respect to Countrywide-related allegations highlights the importance and impact of the non-public loan origination data relative to Lewis' statement, a matter that should not have been resolved at the pleading stage.

45

## IV.  **CONCLUSION**

For the reasons stated herein above, the lower court erred on the several grounds outlined above.   For these reasons, the Judgment must be reversed with instructions to the District Court to permit the filing of Lead Plaintiff's proposed SAC and resolve the matters of the case on the merits.

Dated:      May 22, 2014          Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By:  _____/s/ Jeffrey R. Krinsk_____
        Jeffrey R. Krinsk
        (Admitted Pro Hac Vice)
        Mark L. Knutson
        (Admitted Pro Hac Vice)
        501 West Broadway, Suite 1250
        San Diego, CA 92101
        Tel: 619.238.1333

            Attorneys for Appellants and Lead
            Counsel for the Class

KLAFTER OLSEN & LESSER LLP

By:  _____/s/ Jeffrey A. Klafter_____
        Jeffrey Klafter
        Two International Place, Suite 350
        Rye Brook, NY 10573
        Tel: 914.934.9200

            Attorneys for Appellants and Liaison
            Counsel for the Class

46

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

>       This brief contains 8,293 words, excluding the parts of the brief
>       exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirement of Fed. R. App. P.
32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6)
because:

>       This brief has been prepared in a proportionally spaced typeface
>       using Microsoft® Office Word 2003, in 14 pt. font size, Times
>       New Roman.

/s/Jeffrey A. Klafter

Attorney for Plaintiffs-Appellants

Dated:    May 22, 2014

47

SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order Denying Plaintiffs' First Motion for Leave to File
    Second Amended Complaint (Pitman, M.J.),
    dated February 15, 2013  ........................................ SPA-1

Clerk's Judgment, dated January 9, 2014  ........................... SPA-49

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

NECA-IBEW PENSION TRUST FUND     :
and DENIS MONTGOMERY, on behalf
of themselves and all others     :
similarly situated,
                                 :    10 Civ. 440 (LAK)(HBP)

                    Plaintiffs,
                                 :    OPINION AND
      -against-                       ORDER
                                 :
BANK OF AMERICA CORPORATION,
et al.,                          :

                    Defendants.  :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.   Introduction


          Plaintiffs NECA-IBEW Pension Trust Fund ("NECA-IBEW")

and Denis Montgomery commenced this putative securities class

action against the BAC Defendants[1] and the Underwriter Defen-

----

          [1] The BAC Defendants include:  Bank of America Corporation;
Banc of America Securities LLC; Kenneth D. Lewis; Joe L. Price;
Neil A. Cotty; William Barnet, III; Frank P. Bramble, Sr.; John
T. Collins; Gary L. Countryman; Tommy R. Franks; Charles K.
Gifford; W. Steven Jones; Walter E. Massey; Thomas J. May;
Patricia E. Mitchell; Thomas M. Ryan; O. Temple Sloan, Jr.;
Meredith R. Spangler; Robert L. Tillman; and Jackie M. Ward.
Plaintiffs treat Banc of America Securities LLC as an underwriter
defendant in the proposed second amended complaint (see Proposed
Second Amended Complaint for Violation of Federal Securities Laws
("Proposed SAC"), annexed as Exhibit A to Declaration of C.
Michael Plavi, II in Support of Plaintiffs' Motion for Leave to
                                             (continued...)

dants[2] on June 19, 2010.  Plaintiffs allege violations of Sec-
tions 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Secu-
rities Act") in connection with two securities offerings made in
2008.

By notice of motion dated March 15, 2012 (Docket Item
61), plaintiffs move for leave to file a second amended class
action complaint pursuant to Fed.R.Civ.P. 15.  For the reasons
set forth below, plaintiffs' motion is denied.

II.  Facts

    A.  Procedural
        History

The allegations underlying plaintiffs' claims are set
forth in detail in my Report and Recommendation dated February 9,
2012, NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., 10 Civ.
440 (LAK)(HBP), 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012),
familiarity with which is assumed.  Accordingly, I shall review
plaintiffs' allegations here in summary fashion.

--------

[1](...continued)
File a Second Amended Class Action Complaint, dated Mar. 15, 2012
(Docket Item 63)("Plavi Decl."), at ¶ 45).

    [2] The Underwriter Defendants include:  Citigroup Global
Markets Inc.; Deutsche Bank Securities; J.P. Morgan Securities
Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan
Stanley & Co. Incorporated; UBS Securities LLC; and Wachovia
Capital Markets, LLC.

Plaintiffs' claims arise out of two Bank of America Corporation ("BAC") public offerings of securities conducted in the first half of 2008:  (1) the "Series K" Offering of January 24, 2008, and (2) the "Series H" Offering securities of May 5, 2008 (Proposed SAC ¶ 1).[3]  Plaintiffs allege that, in connection with these offerings, BAC and its underwriters made various misrepresentations with respect to the value of BAC's loan portfolio and the quality of the assets of Countrywide Financial Corporation ("Countrywide"), which BAC had acquired in 2008 (Reply in Support of Plaintiffs' Motion for Leave to File a Second Amended Class Action Complaint, dated May 18, 2012 (Docket Item 71)("Pls.' Reply. Mem."), at 1).  The Honorable Lewis A. Kaplan initially referred the matter to me to issue a Report and Recommendation on defendants' motion to dismiss the plaintiffs' first amended complaint for failure to state a claim (Docket Item 23).

On February 9, 2012, I issued a Report and Recommendation, recommending that defendants' motion to dismiss be granted in its entirety.  NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL 3191860.  However, because

---

[3] Plaintiffs' Proposed SAC does not contain any claims concerning the "Series L" offering, also conducted on January 24, 2008, and I assume that plaintiffs have abandoned their claims(Proposed SAC ¶ 1).

3

plaintiffs, in addition to opposing the motion to dismiss, requested leave to amend their complaint but failed to include with their request a copy of the proposed amended pleading, I denied the application to amend without prejudice to renewal by way of formal motion.  NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL 3191860 at *25.  On March 15, 2012, plaintiffs moved for leave to file a second amended complaint, and included with the motion a copy of their proposed amended pleading (Docket Item 61).[4]

In an Order issued March 16, 2012 (Docket Item 65)("March 16 Order"), Judge Kaplan adopted the February 9, 2012 Report and Recommendation in full, dismissing plaintiffs' first amended complaint.  Judge Kaplan stated that

> To a very large extent, [plaintiffs' first amended complaint] complains of statements of belief and omissions, the truth or falsity of which depends upon what view the maker held at the time they occurred, e.g., the adequacy of loan loss reserves and pre-acquisition due diligence, the value of instruments not traded on efficient markets and for which valuation therefore was a matter of opinion, the proper amounts of reserves, whether Bank of America was well capitalized, capital and leverage ratios that depended upon valuation of instruments not traded on efficient markets, the adequacy of internal controls, and so on. But there is nothing in the complaint that suggests

---

[4] By stipulation of the parties, plaintiffs filed their first amended complaint on June 18, 2011 (First Amended Complaint for Violation of Federal Securities Laws, dated January 14, 2011 (Docket Item 25)).

4

> that Bank of America did not, at the times relevant to
> the issue of the truth or falsity of its statements,
> actually hold the opinions and beliefs in question.

(March 16 Order at 1-2).  Regarding plaintiffs' pending motion

for leave to amend their complaint, Judge Kaplan noted that

> So far as the request for leave to amend is
> concerned, plaintiffs argue that they should be
> afforded the opportunity, unconditionally, to file any
> amended complaint they see fit in the event the motions
> to dismiss are granted.  They are mistaken.  The point
> in any case now is academic, as they yesterday moved
> for leave to file a second amended complaint, which the
> defendants are free to oppose, should they wish to do
> so, on the ground that the proposed amendment would be
> futile.

(March 16 Order at 2).  On that same date, Judge Kaplan referred

the matter to me to issue a decision on plaintiffs' motion for

leave to file a second amended complaint (Docket Item 64).

    B.   Plaintiffs' Proposed
         Second Amended Complaint

    Plaintiffs' proposed second amended complaint

("proposed SAC") includes numerous alterations and new factual

allegations in an attempt to rectify the deficiencies noted in my

February 9, 2012 Report and Recommendation.  The new content set

forth in the proposed SAC falls into two major categories:  (1)

new allegations concerning BAC's allegedly improper accounting of

collateralized debt obligation ("CDO")-related assets in 2007-

2008 and (2) new allegations purportedly showing that statements

5

**SPA-6**

about the Countrywide acquisition made by Defendant Kenneth
Lewis, the former CEO of BAC, were knowing falsehoods (Pls.'
Reply Mem. at 1).  In other respects, the claims raised in
plaintiffs' proposed SAC are substantially similar those raised
in the first amended complaint and addressed in my February 9,
2012 Report and Recommendation.

Plaintiffs' new accounting allegations concern actions
taken by BAC management in 2007, all of which allegedly resulted
in material misstatements in the Series K and Series H offering
documents.  Plaintiffs' principal new allegation appears to be
that beginning in mid-2007, BAC's management "remove[d] its
entire CDO portfolio and CDO-related assets from the scrutiny of
the Company's Value-at-Risk [("VAR")] statistical model and other
internal financial risk controls," thereby "mask[ing] the
Company's true CDO loss exposure to the investing public and
delay[ing] appropriate asset write downs and the taking of loss
reserves for [BAC's] CDO portfolio" (Memorandum of Law in Support
of Plaintiff's Motion for Leave to File a Second Amended Class
Action Complaint, dated Mar. 15, 2012 (Docket Item 62)("Pls.'
Mem.), at 3-4).  Plaintiffs argue that the removal of CDOs from
BAC's VAR models enabled BAC to avoid costly writedowns at the
end of 2007 and retain its status as "well capitalized" under

federal banking regulations, allowing it to conduct the Series K offering on more favorable terms (Pls.' Mem. at 4).

Plaintiffs' new allegations concerning Countrywide relate to representations made by Defendant Lewis on January 11, 2008, when BAC announced the acquisition of Countrywide.  In particular, plaintiffs continue to attack Lewis's statement that "much of [Countrywide's] originations in the current market are of much higher quality and better spreads than the past couple years." (Pls.' Mem. 5-6).  According to plaintiffs, information provided by BAC to the Financial Crisis Inquiry Commission ("FCIC"), which did not become publicly available until February 2011, combined with BAC's "extensive due diligence" prior to the acquisition, demonstrates the objective falsity of Lewis's statements and that Lewis could not have believed them when they were made (Pls.' Mem. 5-7).

Defendants argue that plaintiffs' motion for leave to amend should be denied as futile.[5]  Defendants first contend that many of plaintiffs' claims continue to be time-barred by the Securities Act's one-year statute of limitations, and that to the extent plaintiff is asserting new allegations, such allegations

---

[5] The Underwriter Defendants adopt the arguments made by the BAC Defendants (The Underwriter Defendants' Opposition to Plaintiffs' Motion for Leave to File a Second Amended Class Action Complaint, dated Apr. 20, 2012 (Docket Item 70), at 1).

are barred by the Securities Act's three-year statute of repose (The BAC Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File a Second Amended Class Action Complaint, dated Apr. 20, 2012 (Docket Item 68)("Opp'n Mem."), at 2-3).  With respect to plaintiffs' accounting-related allegations, defendants continue to assert that the documents plaintiffs' cite contain no material misrepresentations, and that many of the documents cited by plaintiff in support of their claim contain the very information that plaintiffs allege is concealed (Opp'n Mem. at 3-4).  Additionally, defendants argue that statements relating to BAC's VAR models are inherently forward-looking, were accompanied by adequate cautionary language and, thus, are shielded by the Private Securities Litigation Reform Act ("PSLRA")'s safe harbor provision and the "bespeaks caution" doctrine (Opp'n Mem. at 21-23).  Finally, with respect to plaintiffs' Countrywide-related allegations, defendants argue that the FCIC data plaintiffs' cite, rather than undermining Lewis's statements, confirms their accuracy (Opp'n Mem. at 12-14).

III.  <u>Analysis</u>

    A.    Standards Applicable to a
           <u>Motion to Amend the Pleadings</u>

        The standards applicable to a motion to amend a
pleading are well settled and require only brief review.  A
motion to amend is governed by Fed.R.Civ.P. 15(a), which provides
that leave to amend should be freely granted when justice so
requires.  Fed.R.Civ.P. 15(a); <u>Foman v. Davis</u>, 371 U.S. 178, 182
(1962); <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d
Cir. 2007); <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co.</u>, 404
F.3d 566, 603 (2d Cir. 2005); <u>Dluhos v. Floating & Abandoned
Vessel, Known as "New York"</u>, 162 F.3d 63, 69 (2d Cir. 1998);
<u>Gumer v. Shearson, Hammill & Co.</u>, 516 F.2d 283, 287 (2d Cir.
1974).  "Nonetheless, the Court may deny leave if the amendment
(1) has been delayed unduly, (2) is sought for dilatory purposes
or is made in bad faith, (3) the opposing party would be
prejudiced, or (4) would be futile."  <u>Kuriakose v. Fed. Home Loan
Mortg. Corp.</u>, 08 Civ. 7281 (JFK), 2012 WL 4364344 at *4 (S.D.N.Y.
Sept. 24, 2012) (Keenan, D.J.), <u>quoting</u> <u>Lee v. Regal Cruises,
Ltd.</u>, 916 F. Supp. 300, 303 (S.D.N.Y. 1996) (Kaplan, D.J.),
<u>aff'd</u>, 116 F.3d 465 (2d Cir. 1997); <u>see</u> <u>McCarthy v. Dun &
Bradstreet Corp.</u>, <u>supra</u>, 482 F.3d at 200; <u>Ellis v. Chao</u>, 336 F.3d

9

114, 126-27 (2d Cir. 2003); Montefiore Med. Ctr. v. Am. Prot. Ins. Co., 00 Civ. 3235 (LTS)(MHD), 2003 WL 21108261 at *1 (S.D.N.Y. May 14, 2003) (Swain, D.J.); Am. Home Assur. Co. v. Jacky Maeder (Hong Kong) Ltd., 969 F. Supp. 184, 187-88 (S.D.N.Y. 1997) (Kaplan, D.J.).  Because defendants oppose plaintiffs' motion to amend solely on the ground that the proposed SAC is futile, I limit my discussion to that issue.

A proposed amendment is futile when it fails to state a claim.  Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990); Mina Inv. Holdings Ltd. v. Lefkowitz, 184 F.R.D. 245, 257 (S.D.N.Y. 1999) (Sweet, D.J.); Parker v. Sony Pictures Entm't, Inc., 19 F. Supp. 2d 141, 156 (S.D.N.Y. 1998) (Kaplan, D.J.), aff'd in pertinent part, vacated in part on other grounds sub nom., Parker v. Columbia Pictures Indus., 204 F.3d 326 (2d Cir. 2000); Yaba v. Cadwalader, Wickersham & Taft, 931 F. Supp. 271, 274 (S.D.N.Y. 1996) (Koeltl, D.J.); Prudential Ins. Co. v. BMC Indus., 655 F. Supp. 710, 711 (S.D.N.Y. 1987) (Sweet, D.J.); see generally Dluhos v. Floating & Abandoned Vessel Known as "New York", supra, 162 F.3d at 69-70.  The party opposing a motion to amend has the burden of demonstrating that a proposed amendment would be futile.  Staskowski v. Cnty. of Nassau, 05 Civ. 5984 (SJF)(WDW), 2007 WL 4198341 at *4 (E.D.N.Y. Nov. 21, 2007); see

also Lugosch v. Congel, No. 00 Civ. 784 (RFT), 2002 WL 1001003 at *1 (N.D.N.Y. May 14, 2002).

A proposed amendment is futile "where the claim or defense proposed to be added has no colorable merit." Oliver v. DeMarinis & Co., 90 Civ. 7950 (SS), 1993 WL 33421 at *2 (S.D.N.Y. Jan. 29, 1993) (Lee, M.J.) (inner quotations omitted); see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 783 (2d Cir. 1984) (if the movant has "colorable grounds for relief," justice requires that leave to amend be granted in the absence of undue delay, bad faith, or prejudice). The "'colorable grounds' requirement mandates that a district court may not deny a motion for leave to amend a pleading [on futility grounds] when said pleading is sufficient to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." Children First Found. Inc. v. Martinez, No. 04 Civ. 0927 (NPM), 2007 WL 4618524 at *5 (N.D.N.Y. Dec. 27, 2007), citing in part Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 244 (2d Cir. 2007); see also Estate of Ratcliffe v. Pradera Realty Co., 05 Civ. 10272 (JFK), 2007 WL 3084977 at *4 (S.D.N.Y. Oct. 19, 2007) (Keenan, D.J.); Journal Publ'g Co. v. Am. Home Assur. Co., 771 F. Supp. 632, 635 (S.D.N.Y. 1991) (Leisure, D.J.); Prudential Ins. Co. v. BMC Indus., Inc., supra, 655 F. Supp. at 711.  In assessing the claimed futility of a proposed

amended pleading, the court must assume the truth of the factual

allegations set forth in the proposed amended pleading.  Edwards

v. City of N.Y., 07-CV-5286 (CPS)(RML), 2009 WL 1910740 at *1

(E.D.N.Y. June 29, 2009); Da Cruz v. Towmasters of N.J., 217

F.R.D. 126, 128 n.1 (E.D.N.Y. 2003); Binder v. Nat'l Life of Vt.,

02 Civ. 6411 (GEL), 2003 WL 21180417 at *2 (S.D.N.Y. May 20,

2003) (Lynch, then D.J., now Cir. J.); Gabourel v. Bouchard

Transp. Co., 901 F. Supp. 142, 144 (S.D.N.Y. 1995) (Chin, then

D.J., now Cir. J.).

> The Supreme Court has established a two-step process
> for determining whether a plaintiff has pled sufficient
> facts to overcome a motion to dismiss.  A court must
> first ignore "mere conclusory statements" or legal
> conclusions, which are not entitled to the presumption
> of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
> (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555
> (2007)).  Then, assuming the veracity of the remaining
> facts, "a complaint must contain sufficient factual
> matter . . . to 'state a claim [for] relief that is
> plausible on its face.'"  Id. (quoting Twombly, 550
> U.S. at 570).  A claim is plausible "when the plaintiff
> pleads factual content that allows the court to draw
> the reasonable inference that the defendant is liable
> for the misconduct alleged."  Id. (emphasis added).
> While this plausibility standard is not "akin to a
> 'probability requirement,'" it "asks for more than a
> sheer possibility that a defendant has acted
> unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).
> Pleading facts that are "'merely consistent with' a
> defendant's liability" is insufficient.  Id. (quoting
> Twombly, 550 U.S. at 557).

Pungitore v. Barbera, 12-1795-CV, 2012 WL 6621437 at *2 (2d Cir.

Dec. 20, 2012); see also Virgil v. Town of Gates, 455 F. App'x

36, 37 (2d Cir. 2012); Smith v. NYCHA, 410 F. App'x 404, 405-06
(2d Cir. 2011).

      "[T]he complaint is deemed to include any written
instrument attached to it as an exhibit or any statements or
documents incorporated in it by reference.  Even where a document
is not incorporated by reference, the court may nevertheless
consider it where the complaint relies heavily upon its terms and
effect, which renders the document integral to the complaint."
Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006),
quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d
Cir. 2002).  In ruling on a motion to dismiss, the court is also
permitted to take judicial notice of certain facts.  See Bryant
v. New York State Educ. Dep't, 692 F.3d 202, 208 (2d Cir. 2012);
Hoffenberg v. Bodell, 01 Civ. 9729 (LAP), 2002 WL 31163871 at *3
(S.D.N.Y. Sept. 30, 2002) (Preska, D.J.) ("The Court also may
consider 'matters of which judicial notice may be taken.'"),
quoting Leonard T. v. Israel Discount Bank of New York, 199 F.3d
99, 107 (2d Cir. 1999).

      The Court of Appeals has repeatedly noted that the
trial court has broad discretion in ruling on a motion to amend.
See, e.g., Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000);
Local 802, Associated Musicians of Greater N.Y. v. Parker
Meridien Hotel, 145 F.3d 85, 89 (2d Cir. 1998); Guzman v. Bevona,

13

**SPA-14**

90 F.3d 641, 649 (2d Cir. 1996); see generally Grace v.
Rosenstock, 228 F.3d 40, 53-54 (2d Cir. 2000).


      B.    Timeliness of
            Plaintiffs' Claims


      Section 13 of the Securities Act provides that "[n]o
action shall be maintained to enforce any liability created under
section 11 or 12(a)(2) of this title unless brought within one
year after the discovery of the untrue statement or the omission,
or after such discovery should have been made by the exercise of
reasonable diligence." 15 U.S.C. § 77m.  Where plaintiffs lack
actual knowledge of the facts giving rise to their claim, courts
in this Circuit have interpreted Section 13 to mean that the one-
year limitation period begins to run when a plaintiff is placed
on "inquiry notice."  See Dodds v. Cigna Sec., Inc., 12 F.3d 346,
350 (2d Cir. 1993).  The Honorable Lewis A. Kaplan, United States
District Judge, has articulated the inquiry notice standard as
follows:

> Once plaintiffs are put on "inquiry notice" --
> that is, when the circumstances would suggest to an
> investor of ordinary intelligence the probability that
> a cause of action existed -- they have a duty to
> inquire.  The duty to inquire can be triggered by
> information contained in the financial press,
> mainstream media, and publicly filed documents.  Often
> referred to as "storm warnings," the "triggering
> information must relate directly to the
> misrepresentations and omissions the Plaintiffs allege

14

**SPA-15**

in their action against the defendants."  Once the duty
to inquire arises, if the investor makes an inquiry,
the court imputes knowledge of what a reasonable
investor would have discovered in the exercise of
reasonable diligence as of the date on which it would
have been discovered.  If the investor makes no
inquiry, the court imputes knowledge as of the date the
duty to inquire arose.

Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 827 (S.D.N.Y.

2010) (Kaplan, D.J.) adhered to on reconsideration, 09 Civ. 1049

(LAK), 2011 WL 4056743 (S.D.N.Y. Mar. 29, 2011).

In addition to this one-year-from-discovery limitations

period, Section 11 and 12 claims are also subject to an absolute

three-year limitations period, commonly referred to as Section

13's statute of repose.  Specifically, Section 13's second

sentence provides that claims under Section 11 or 12(a)(1) of the

Securities Act must be brought within three years of the date on

which the security was first offered to the public and that

claims under Section 12(a)(2) must be brought within three years

of the sale of the security.  15 U.S.C. § 77m.  This three-year

limitations period provides an "'absolute'" limit actions brought

under Sections 11 or 12.  In re Lehman Bros. Sec. & ERISA Litig.,

09 Civ. 1944 (LAK), 2012 WL 4866504 at *5 (S.D.N.Y. Oct. 15,

2012) (Kaplan, D.J.).

In Merck & Co. v. Reynolds, --- U.S. ---, 130 S.Ct.

1784 (2010), the Supreme Court addressed whether inquiry notice

15

was sufficient to start the limitations period applicable to claims brought under the Securities Exchange Act of 1934.  The statute at issue in <u>Merck</u> -- 28 U.S.C. § 1658 -- provided, in pertinent part, that private actions brought under the anti-fraud provisions of the Exchange Act had to be commenced "not later than the earlier of -- (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  The Court in <u>Merck</u> rejected the application of an inquiry notice standard to this statute and held that the limitations period for claims covered by the statute begins to run when a "reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'"  <u>Merck & Co., Inc. v. Reynolds</u>, <u>supra</u>, 130 S. Ct. at 1798.

In <u>City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.</u>, 637 F.3d 169 (2d Cir. 2011), the Court of Appeals for the Second Circuit held that, under <u>Merck</u>, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."  <u>City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.</u>, <u>supra</u>, 637 F.3d at 175.  Thus, under the <u>Merck</u>/<u>City of Pontiac</u> triggering standard, a limitations period will not commence until a reasonably diligent plaintiff could have "plead [the] fact[s]" underlying the claim "with sufficient detail and

16

particularity to survive a 12(b)(6) motion to dismiss." <u>City of</u>
<u>Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.</u>, <u>supra</u>, 637 F.3d
at 175.

> <u>City of Pontiac</u> left open the question of whether the
<u>Merck</u> standard applies to claims arising under the Securities
Act, or whether such claims are still governed by the inquiry
notice standard.  District Judges within this District are not
only split on whether <u>Merck</u> and <u>City of Pontiac</u> are applicable to
claims brought under the Securities Act, they are even split on
which view is the majority view.  <u>Compare Pennsylvania Public</u>
<u>Sch. Employees' Ret. Sys. v. Bank of Am. Corp.</u>, 11 Civ. 733
(WHP), 2012 WL 2847732 at *20 (S.D.N.Y. July 11, 2012) (Pauley,
D.J.) ("The majority of courts in this district declined to apply
<u>Merck</u> to Section 11 claims . . . .") <u>with</u> <u>In re Bear Stearns</u>
<u>Mortg. Pass-Through Certificates Litig.</u>, 851 F. Supp. 2d 746, 762
(S.D.N.Y. 2012) (Swain, D.J.) ("The question before the Court is
whether the Supreme Court's invalidation of the inquiry notice
standard for '34 Act claims extends to claims brought under
Sections 11 and 12(a)(2) of the '33 Act.  The Court concludes, in
accord with the majority of judges in this district, that it
does.").

> Finally, although the Second Circuit has observed that
whether adequate facts existed to place a plaintiff on notice is

"often inappropriate for resolution on a motion to dismiss," the court has also "stated that courts can 'readily resolve the issue' of inquiry notice as a matter of law on a motion to dismiss -- as has been done in 'a vast number of cases' in this circuit -- where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint.'"  Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 412 (2d Cir. 2008), quoting Marks v. CDW Computer Ctrs., Inc., 122 F.3d 363, 367 (7th Cir. 1997) and Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005).  In making such a determination, "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters."  Staehr v. Hartford Fin. Servs. Group, Inc., supra, 547 F.3d at 425 (2d Cir. 2008).

     Given the difference in the language of the two statutes of limitations, the logic of those Judges that have concluded that Merck does not extend to actions brought under the Securities Act is compelling.  Nevertheless, I conclude that even if the more permissive Merck standard is applied, the claims

alleged in the proposed SAC are time-barred, and, therefore, the
proposed SAC is futile.[6]  Because plaintiffs' accounting
allegations and Countrywide-related allegations are distinct and
independent, I shall analyze them separately for statute of
limitations purposes.

> 1.   Improper Accounting
>      <u>Allegations</u>

Plaintiffs argue that "the 'facts' publicly available
to Plaintiffs for statute of limitations 'discovery' purposes
[did] not reach the level cognizable under the <u>Merck</u>/<u>City of
Pontiac</u> threshold until January 16, 2009, when BAC issued a press
release reporting its fourth quarter and full year 2008 financial
results" (Pls.' Reply Mem. at 16).  It was only then, plaintiffs
argue, that "BAC acknowledged -- for the first time -- the
necessity of billions of dollars in write downs and net-charge
offs for problematic CDOs, MBSs, and loans and leases due [to]

---

[6] The proposed SAC also fails to contain the allegations
necessary to establish timeliness.  "For Securities Act claims, a
plaintiff must allege the time and circumstances of his discovery
of the material misstatement or omission upon which his claim is
based."  <u>In re Direxion Shares ETF Trust</u>, 279 F.R.D. 221, 231
(S.D.N.Y. 2012) (Forrest, D.J.), <u>citing</u>  <u>In re Chaus Secs.
Litig.</u>, 801 F.Supp. 1257, 1265 (S.D.N.Y. 1992).  Plaintiffs
provide no such allegations in the proposed SAC.  The statute of
limitations arguments discussed herein are drawn from Plaintiffs'
Reply in support of the present motion.

the combining of Countrywide's operations with those of BAC, and also increased provisions for future asset write downs, losses, and reserves" (Pls.' Reply Mem. at 16 n.18).   Upon examining the facts available during the relevant time period, however, I conclude that a reasonably diligent investor of ordinary intelligence would have had sufficient facts to plead a violation of the Securities Act by late 2008, and that plaintiffs' claims were time-barred by late 2009.

        Plaintiffs' new allegations concerning BAC's allegedly improper removal of its CDO-related assets from its VAR models -- and the resulting ramifications of these actions -- concern conduct that is unrelated to BAC's acquisition of Countrywide, and allege misrepresentations and omissions in financial disclosures beginning in 2007, before the acquisition of Countrywide even took place.   Thus, plaintiffs' assertion that January 16, 2009 should serve as the statute of limitations start date because "[p]rior to that date, BAC had never publicly reported the results of the combined operations of Countrywide and BAC" improperly conflates, for statute of limitations purposes, plaintiffs' Countrywide-related claims with claims that relate only to BAC's earlier accounting practices (Pls.' Reply Mem. at 16).

Plaintiffs' proposed SAC offers several more plausible clues as to when a reasonably diligent plaintiff would have discovered the facts underlying the improper accounting claims. For example, according to the proposed SAC:

> BofA [did not] disclose the 70% write down on assets held in its CDO warehouse and sales and trading activities the Company had taken in the third quarter 2007 [] or otherwise disclose these write downs in the Bank's January 22, 2008 Form 8-K issued a scant few days before the $6 billion Series K . . . Offering[]. Instead, this highly material information, although internally known all along to BofA's senior management throughout the second half of 2007, was not publicly disclosed until February 28, 2008, when the Company filed its 2007 Form 10-K.

(Proposed SAC ¶ 73 (emphasis added)).  Similarly, the proposed SAC alleges that "[o]n February 28, 2008, BofA filed its 2007 Form 10-K in which it disclosed, for the first time," that the procedures for VAR testing CDOs had been revised (Proposed SAC ¶ 94 (emphasis added)).  The proposed SAC also states that BAC disclosed, in its Q1 2008 10-Q, filed May 8, 2008, that its "CDOs, structured financial products, and related MBS and derivative assets" were reinstated into its VAR models (Proposed SAC ¶ 95 n.6).  Thus, according to the complaint, by mid-2008, the facts comprising the core of plaintiffs' accounting claims, that certain assets were strategically excluded from BAC's VAR models during a crucial time period, and that certain writedowns

were later taken, were publicly available and contained within
the BAC financial disclosures plaintiffs cite.

        BAC's increasingly precarious financial health during
2007-2008, as evidenced by the financial disclosures cited in the
proposed SAC, would also have come to the attention of a
reasonably diligent plaintiff.  As I noted it my February 9, 2012
Report and Recommendation, "BAC's public filings [] demonstrate
that BAC [] provided for increasing loss reserves throughout the
relevant time period -- specifically, beginning in the third
quarter of 2007 and throughout the period leading up to the
Series H and K offerings, implying that the risk of non-payment
was increasing throughout the period."  NECA-IBEW Pension Trust
Fund v. Bank of Am. Corp., supra, 2012 WL 3191860 at *12; see
also Proposed SAC ¶¶ 98-101; 105-08.  Such an ominous trend
should have put plaintiffs on notice, by no later than the end of
2008, that they might have had a claim.  See LC Capital Partners,
LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003)
("[A] series of three charges in substantial and increasing
amounts for the same purpose within four years should alert any
reasonable investor that something is seriously wrong."); Freidus
v. ING Groep N.V., 736 F. Supp. 2d 816, 827 (S.D.N.Y.
2010)(Kaplan, D.J.); In re NovaGold Res. Inc. Sec. Litig., 629 F.
Supp. 2d 272, 288 (S.D.N.Y. 2009) (Cote, D.J.).  During this

period, it was also well-known, not only amongst sophisticated investors but amongst the general public, that many of the dramatic losses suffered by banks like BAC were attributable to their subprime investments.  Lighthouse Fin. Group v. Royal Bank of Scotland Group, PLC, supra, 2012 WL 4616958 at *13 (S.D.N.Y. Sept. 28, 2012) ("Throughout late 2007 and 2008 -- when some of the largest banks in the world failed because of their exposure to securitized assets -- it was common knowledge that these large banks had over-exposed themselves to lower quality assets.").

Therefore, I conclude that by no later than late 2008, more than one year prior to the filing of plaintiffs' complaint on January 19, 2010, a reasonably diligent investor of ordinary intelligence would have had sufficient information about BAC's CDO writedowns and possible exclusion of CDO-related assets from its VAR models to adequately plead these facts in a complaint. Given the publicly available financial disclosures and the unprecedented financial turmoil in 2007-2008, plaintiffs' contention to the contrary is unconvincing.

Thus, for the reasons stated above, I conclude that plaintiffs' CDO-related claims are time-barred under Section 13's one-year statute of limitations.[7]

---

[7] Because I conclude that plaintiffs' CDO-related claims are
(continued...)

23

2.   Countrywide-Related
     Allegations

Plaintiffs argue that "the allegations regarding Lewis'
misrepresentations of the quality and spreads of Countrywide's
loan originations" are timely because "the data relating to
Countrywide's 2007 loan originations was not publicly available
until February 13, 2011 when the FCIC released the information"
(Pls.' Reply Mem. at 17).  Thus, contend plaintiffs, February 13,
2011 is the commencement date for the one-year statute of
limitations, because before that date, plaintiffs lacked
"sufficient information about that fact to adequately plead it in
a complaint" (Pls.' Reply Mem. at 17, citing City of Pontiac Gen.
Employees' Ret. Sys. v. MBIA, Inc., supra, 637 F.3d at 175).  As
was the case with plaintiffs' improper accounting allegations
discussed above, this argument is also unavailing.

Plaintiffs' argument is belied by their pleadings.  The
assertion that the statute of limitations for claims arising from

---

[7](...continued)
time-barred under Section 13's one-year statute of limitations,
it is unnecessary to reach the issue of whether the claims are
new and are thus barred by Section 13's three-year statute of
repose, which is not subject to equitable tolling or Fed.R.Civ.P.
15(c)'s relation back provisions.  See Footbridge Ltd. Trust v.
Countrywide Fin. Corp., 770 F. Supp. 2d 618, 624 (S.D.N.Y.
2011)(Castel, D.J.)("By the plain language of section 13, the
three-year statute of repose is absolute.")

Lewis's alleged misrepresentations did not commence until
February 13, 2011 is difficult to comprehend, because allegations
about Lewis's statements during the January 11, 2008 conference
call were included in plaintiffs' first amended complaint, filed
on January 18, 2011, a month before the FCIC data was released
(First Amended Complaint for Violation of Federal Securities
Laws, dated Jan. 14, 2011 (Docket Item 25), at ¶¶ 83-87).  Thus,
the argument that plaintiffs could not have had "sufficient
information" to bring these claims until after they were already
raised in the first amended complaint is contradicted by
plaintiffs' own conduct.  Not only could plaintiffs have asserted
these claims earlier than they now claim, they did.[8]

Because plaintiffs' proposed commencement date is
untenable on its face, it is again necessary to determine when a
"reasonably diligent plaintiff would have discovered 'the facts
constituting the violation[s].'"  Merck & Co., Inc. v. Reynolds,
supra, 130 S. Ct. at 1798.  Upon examining the facts available

---

[8] Equally problematic for plaintiffs is that by arguing that
they could not have had sufficient information until February 13,
2011 to adequately plead Lewis's misrepresentations, they are
essentially conceding that their claims as to the Series K
offering, which occurred on January 24, 2008, are barred under
the three-year statute of repose, which is subject to neither
equitable nor relation back tolling and would have expired on
January 24, 2011.  See Footbridge Ltd. Trust v. Countrywide Fin.
Corp., supra, 770 F. Supp. 2d at 624.

**SPA-26**

during the relevant time period, I again conclude that by late 2008, a reasonably diligent plaintiff of ordinary intelligence would have had sufficient facts to plead a violation of the Securities Act predicated on Lewis's allegedly misleading statements.

Even if the general financial instability of BAC throughout 2007 and 2008, discussed above, was not enough to trigger the running of the statute of limitations period as to plaintiffs' Countrywide-related claims, there was ample adverse information regarding Countrywide in particular during the same time period.  First, there were many federal actions filed against Countrywide in 2007 and 2008, the complaints of which raise claims extremely similar to those raised in the proposed SAC.[9]  Countrywide-related litigation and Countrywide's lax

---

[9] See The BAC Defendants' Memorandum of Law in Support of Law in Support of Their Motion to Dismiss the First Amended Complaint for Failure to State a Claim, dated Mar. 4, 2011, at Appendix A, citing complaints from In re Countrywide Financial Corp. Sec. Litig., No. 07-cv-05295 (C.D. Cal.); Norfolk County Retirement System v. Countrywide Financial Corp., No. 07-cv-05727 (C.D. Cal. Aug. 31, 2007); Alvidres v. Countrywide Financial Corp., No. 07-civ-05810 (C.D. Cal. Sept. 6, 2007); Johnson v. Countrywide Financial Corp., No. 07-cv-05879 (C.D. Cal. Sept. 10, 2007); Oni v. Countrywide Financial Corp., No. 07-cv-06096 (C.D. Cal. Sept. 19, 2007); Thompson v. Countrywide Financial Corp., No. 07-cv-06190 (C.D. Cal. Sept. 24, 2007); Pro v. Countrywide Financial Corp., No. 07-cv-06252 (C.D. Cal. Sept. 26, 2007); New Jersey Carpenters' Pension Fund v. Mozilo, No. 378319 (L.A. Sup. Ct. Oct. 1, 2007); Arkansas Teacher Retirement System v. Mozilo,
(continued...)

lending practices also received prominent press coverage during
the same time period, in such publications as <u>The New York Times</u>
and <u>The Wall Street Journal</u> (Declaration of Jonathan Rosenberg,
Esq. in Support of the BAC Defendants' Motion to Dismiss the
First Amended Complaint for Failure to State a Claim, dated Mar.
4, 2011 (Docket Item 31)("Rosenberg Decl."), Exhibits S-U).

Plaintiffs' assertion that "given the positive
affirmative representation by Lewis following BAC's due
diligence, a reasonable investor would likely have concluded that
Countrywide had been able to put its troubled past behind it" is
also unpersuasive (Pls.' Reply Mem. at 15).  "[R]eassuring
statements will prevent the emergence of a duty to inquire or
dissipate such a duty only if an investor of ordinary
intelligence would reasonably rely on the statements to allay the
investor's concern."  <u>LC Capital Partners, LP v. Frontier Ins.</u>

---

[9](...continued)
No. 07-cv-06923 (C.D. Cal. Oct. 24, 2007).

Plaintiffs cite <u>In re Bear Stearns Mortg. Pass-Through
Certificates Litig.</u>, 851 F. Supp. 2d 746, 765 n.16 (S.D.N.Y.
2012) (Swain, D.J.) for the proposition that "[p]laintiffs cannot
be charged with knowledge of every suit filed against an
originator."  However, in that case, defendants cited only two
"tangentially related" complaints that did not "receive[] wide
press coverage."  <u>In re Bear Stearns Mortg. Pass-Through
Certificates Litig.</u>, 851 F. Supp. 2d 746, 765, 765 n.16 (S.D.N.Y.
2012).  The publicly available information concerning Countrywide
in 2008 was far more extensive.

Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003).  "Whether
reassuring statements justify reasonable reliance that apparent
storm warnings have dissipated will depend in large part on how
significant the company's disclosed problems are, how likely they
are of a recurring nature, and how substantial are the
'reassuring' steps announced to avoid their recurrence."  LC
Capital Partners, LP v. Frontier Ins. Group, Inc., supra, 318
F.3d at 155.  Lewis's statements were made in the context of
financial disclosures that referenced growing instability within
BAC's loan portfolios, and were proceeded by months of deepening
losses and general market turmoil (see Proposed SAC ¶¶ 63-70).
As I noted in the February 9, 2012 Report and Recommendation,
"information about Countrywide's then-existing financial state,
presumably, was also publicly available to some extent from
Countrywide's own financial disclosures to the investing public
(as it was also a corporation with publicly traded stock) as well
as from the financial press during the relevant time period."
NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL
3191860 at *19; see, e.g. Eric Dash, Acquisition of Lender Is
Possibly in Jeopardy, N.Y. Times, May 6, 2008, at C; Serena Ng
and Cynthia Koons, Downgrades Show Storm Isn't Over, Wall St.
Journal, May 3, 2008, at B1.  Thus, even if Lewis's brief
statements were enough to allay the fears of a reasonable

investor, such comfort would have quickly dissipated amid the increasingly catastrophic financial climate of 2008, and would have certainly been gone well before January 16, 2009.

In short, by mid to late 2008, there was an abundance of publically available information, including BAC financial disclosures, well-publicized litigation involving substantially similar claims, and general market data, all of which plaintiffs could have employed to state a claim that Lewis's statements were material misrepresentations under the Securities Act.  The suggestion that it was not until January 16, 2009 that a reasonably diligent plaintiff would have discovered facts potentially undermining the veracity of Lewis's January 11, 2008 statements is hard to fathom.  Thus, as above, I conclude that by late 2008 at the latest, a reasonably diligent investor of ordinary intelligence would have discovered the facts constituting the Countrywide-related violations that plaintiffs allege.  Merck & Co., Inc. v. Reynolds, supra, 130 S. Ct. at 1798.

Thus, for all the foregoing reasons, I find that plaintiffs' claims are time-barred, and that granting plaintiffs leave to file a second amended complaint would, thus, be futile. In the interest of completeness, however, I shall also address

defendants' second argument that the proposed SAC fails to state

a claim under the Securities Act.

       C.    Standards Applicable to
            Sections 11, 12(a)(2), and 15
            <u>of the Securities Act</u>

       The standards applicable to claims arising under the

Securities Act pursuant to Sections 11, 12(a)(2), and 15 were

succinctly set forth by the Court of Appeals for the Second

Circuit in <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d

347, 358-60 (2d Cir. 2010).  Specifically, the Second Circuit

stated:

> Sections 11, 12(a)(2), and 15 of the Securities Act
> impose liability on certain participants in a
> registered securities offering when the publicly filed
> documents used during the offering contain material
> misstatements or omissions.  Section 11 applies to
> registration statements, and [S]ection 12(a)(2) applies
> to prospectuses and oral communications.  15 U.S.C.
> §§ 77k(a), 77l(a)(2).  Section 15, in turn, creates
> liability for individuals or entities that "control [ ]
> any person liable" under [S]ection 11 or 12.  <u>Id</u>.
> § 77o.  Thus, the success of a claim under section 15
> relies, in part, on a plaintiff's ability to
> demonstrate primary liability under [S]ections 11 and
> 12.  <u>See</u>, <u>e.g.</u>, <u>SEC v. First Jersey Sec., Inc.</u>, 101
> F.3d 1450, 1472-73 (2d Cir. 1996).

<u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, <u>supra</u>, 592 F.3d at

358; <u>see also</u> <u>Fait v. Regions Fin. Corp.</u>, 655 F.3d 105, 109 & n.2

(2d Cir. 2011); <u>In re Barclays Bank PLC Sec. Litig.</u>, 09 Civ. 1989

(PAC), 2011 WL 31548 at *5 & n.15 (S.D.N.Y. Jan. 5, 2011)

(Crotty, D.J.).  "Issuers are subject to 'virtually absolute'
liability under [S]ection 11, while the remaining potential
defendants under [S]ections 11 and 12(a)(2) may be held liable
for mere negligence."  In re Morgan Stanley Info. Fund Sec.
Litig., supra, 592 F.3d at 359, citing Herman & MacLean v.
Huddleston, 459 U.S. 375, 382 (1983); see also Fait v. Regions
Fin. Corp., supra, 655 F.3d at 109.

        Section 11 "provides for a cause of action by the
purchaser of the registered security against the security's
issuer, its underwriter, and certain other statutorily enumerated
parties."  In re Morgan Stanley Info. Fund Sec. Litig., supra,
592 F.3d at 358; see also Freidus v. ING Groep N.V., 736 F. Supp.
2d 816, 825 (S.D.N.Y. 2010) (Kaplan, D.J.); In re Fuwei Films
Sec. Litig., 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009)
(Sullivan, D.J.).  In order to state a claim under Section 11, a
plaintiff must allege:  (1) the purchase of a registered
security, "either directly from the issuer or in the aftermarket
following the offering;" (2) that the defendant was an offering
participant "sufficient to give rise to liability under [S]ection
11;"[10] and (3) that the registration statement "'contained an

_____

        [10] The parties statutorily enumerated in Section 11 include:
(1) "every person who signed the registration statement;" (2)
"every person who was a director of (or person performing similar
                                                (continued...)

31

SPA-32

untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 358-59, citing 15 U.S.C. § 77k(a); see also In re Fuwei Films Sec. Litig., supra, 634 F. Supp. 2d at 435.

"Whereas the reach of [S]ection 11 is expressly limited to specific offering participants, the list of potential defendants in a [S]ection 12(a)(2) case is governed by a judicial interpretation . . . known as the 'statutory seller' requirement."  In re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 359, citing, inter alia, Pinter v. Dahl, 486 U.S. 622, 643-47 & n.21 (1988); see also Freidus v. ING Groep N.V., supra, 736 F. Supp. 2d at 825-26.  Thus, in order to state a claim under Section 12(a)(2), a plaintiff must allege that:

_____

[10](...continued)
functions) . . . the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;" (3) "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions . . . . ;" (4) "every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement . . . . ;" and (5) "every underwriter with respect to such security."  15 U.S.C. § 77k(a).

(1) the defendant is a "'statutory seller';"[11] (2) the sale
occurred "'by means of a prospectus or oral communication'"; and
(3) the prospectus or oral communication "'include[d] an untrue
statement of material fact or omit[ted] to state a material fact
necessary in order to make the statements, in the light of the
circumstances under which they were made, not misleading.'"  In
re Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 359,
citing 15 U.S.C. § 77l(a)(2); see also In re Fuwei Films Sec.
Litig., supra, 634 F. Supp. 2d at 435.

       Claims under Sections 11 and 12(a)(2) have "roughly
parallel elements."  In re Morgan Stanley Info. Fund Sec. Litig.,
supra, 592 F.3d at 359; see also Fait v. Regions Fin.
Corp., supra, 655 F.3d at 109; In re Barclays Bank PLC Sec.
Litig., supra, 2011 WL 31548 at *5.  Accordingly, these claims
"are usually evaluated in tandem because if a plaintiff fails to
plead a cognizable Section 11 claim, he or she will be unable to
plead one under Section 12(a)."  Lin v. Interactive Brokers Grp.,
Inc., 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (McMahon, D.J.);

---

       [11] A "statutory seller" includes one who has "'passed title,
or other interest in the security, to the buyer for value,'" or
"'successfully solicit[ed] the purchase [of a security],
motivated at least in part by a desire to serve his own financial
interests or those of the securities['] owner.'"  In re Morgan
Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010),
citing in part Pinter v. Dahl, 486 U.S. 622, 642 (1988).

accord <u>In re Wachovia Equity Sec. Litig.</u>, 753 F. Supp. 2d 326,

368 (S.D.N.Y. 2011) (Sullivan, D.J.).  Thus, I shall evaluate

plaintiffs' Section 11 and 12(a)(2) claims together.[12]

_____

[12] In my February 9, 2012 Report and Recommendation, I
determined that Fed.R.Civ.P. 9(b)'s heightened pleading standard
was inapplicable to plaintiffs' claims.  <u>NECA-IBEW Pension Trust
Fund v. Bank of Am. Corp.</u>, <u>supra</u>, 2012 WL 3191860 at *6 n.9.  As
they did in the first amended complaint, plaintiffs continue
disclaim any allegations of fraud against defendants in the
proposed SAC (Proposed SAC ¶ 160).  However, in light of the new
allegations contained in plaintiffs' proposed SAC, reconsidering
the applicability of Rule 9(b) is warranted.

    Many of plaintiffs' new allegations, from their plain
language, appear to be alleging fraudulent conduct.  Among
plaintiffs' new allegations:

- [The] undisclosed practice of purportedly valuing
  CDOs and their related assets at [Statement of
  Financial Accounting Standards ("SFAS")] Level 2's
  "observable inputs" criteria, yet excluding these
  same assets from VAR and stress testing and,
  instead subjecting them to an asset valuation
  determination based [on] SFAS 157 Level 3's
  "management judgment or estimation," was a
  practice that continued throughout the fourth
  quarter 2007 before being discontinued in 1Q '08.
  It also was an accounting manipulation approved of
  by senior management (including the Individual
  Defendants) (SAC ¶ 86).

- [B]y removing the "super senior" CDOs from VAR in
  3Q '07 -- which constituted <u>all</u> of the Bank's CDOs
  and their corresponding MBSs and derivative assets
  -- BofA's senior management . . . chose to mask
  the Company's true CDO loss exposure to the
  investing public and wantonly delay appropriate
  asset write downs and the taking of loss reserves
  for BofA's CDO portfolio during the second half of
  2007 (SAC ¶ 88 (emphasis in original)).

(continued...)

[12](...continued)

> • BofA's senior management and the Individual
>   Defendants agreed to remove the Company's $26.2
>   billion block of "super senior" CDOs, warehoused
>   MBSs, and associated CDO-derivative assets from
>   BofA's VAR model and stress testing and analytics
>   . . . as a means to avoid having to publicly
>   report the mark-to-market value of these products
>   (SAC ¶ 95).

Although "plaintiffs must be allowed leeway to draft their complaint in a comprehensible narrative form," City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011), words and phrases like "manipulation," "mask," "wantonly," and "agreed . . . as a means to avoid having to publicly report" strongly suggest that plaintiff is alleging more than mere negligence.  See Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004)(Securities Act claims sounded in fraud when "the wording and imputations of the complaint are classically associated with fraud:  that the Registration statement was 'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that 'materially false and misleading written statements' were issued."); In re China Valves Tech. Sec. Litig., 11 Civ. 0796 (LAK), 2012 WL 4039852 at *9 (S.D.N.Y. Sept. 12, 2012) (Kaplan, D.J.); Lighthouse Fin. Group v. Royal Bank of Scotland Group, PLC, supra, 2012 WL 4616958 at *4; Ladmen Partners, Inc. v. Globalstar, Inc., 07 Civ 0976 (LAP), 2008 WL 4449280 at *11-*13 (S.D.N.Y. Sept. 30, 2008) (Preska, D.J.). Plaintiffs' use of the word "manipulation" in particular, is a classic indicator of fraud.  See Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 129 (2d Cir. 2011) ("The Supreme Court has observed that the word 'manipulative' is 'virtually a term of art when used in connection with securities markets.'"), quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976). Nevertheless, because I conclude that plaintiffs' claims are insufficient even under Fed.R.Civ.P. 8's more relaxed pleading standard, it is unnecessary to conclude whether any of plaintiffs' claims truly sound in fraud and are governed by Rule 9(b)'s heightened pleading standard.

D.   Application of the
     Foregoing Principles to
     Plaintiffs' Claims

In adopting the February 9, 2012 Report and

Recommendation, Judge Kaplan noted that plaintiffs' first amended

complaint was replete with "statements of belief and omissions,

the truth or falsity of which depends upon what view the maker

held at the time they occurred," and that there was "nothing in

the complaint that suggests that Bank of America did not, at the

times relevant to the issue of the truth or falsity of its

statements, actually hold the opinions and beliefs in question"

(March 16 Order at 1-2).  In an attempt to overcome these

defects, plaintiffs' proposed SAC contains an abundance of new

allegations regarding BAC's allegedly improper accounting

practices and the quality of Countrywide's originations at the

time of its acquisition (Pls.' Reply Mem. at 1).  However,

plaintiffs proposed SAC is still insufficient in two major

respects.  First, plaintiffs are still unable to show "that any

of the statements of belief and omissions complained of, the

truth or falsity of which depended upon the beliefs of the maker

at the time they occurred, was false" (March 16 Order at 2).

Second, and perhaps more fundamentally, despite the volume of new

content in the proposed SAC, plaintiffs still fail to allege

sufficiently, other than in a conclusory fashion,[13] that
defendants, at the time the alleged misrepresentations were made,
"did not in fact entertain the opinions or hold the belief upon
which the claims are based" (March 16 Order at 1).  For these
reasons, the proposed SAC is still unable to withstand a motion
to dismiss under Rule 12(b)(6), and thus, leave to amend should
be denied on the ground of futility.

a.   Allegations Relating to Asset
     Reclassifications, Writedowns,
     Charge-offs and
     Internal Financial Controls

Plaintiffs newly added allegations assert that the
Series H and Series K offering documents were materially
misleading due to the non-disclosure of certain asset
reclassifications within BAC's loan portfolios, specifically, the
alleged removal of CDO-related assets from BAC's internal VAR
models (see Proposed SAC ¶¶ 71-97).  BAC's alleged decision to
remove CDOs from the VAR models, argue plaintiffs, resulted in
the CDOs being valued pursuant to SFAS 157 Level 3 (management
judgment and estimation) instead of SFAS Level 2 (mark-to-
market), and ultimately allowed BAC to avoid taking $4.5 billion
in additional write downs at the end of 2007 (Proposed SAC ¶¶ 10,

---

[13] See Proposed SAC ¶¶ 97, 131.

16, 71-97).  Additionally, according to plaintiffs, "BAC's

undisclosed removal of CDOs from VAR and its other risk

management controls, and de facto treatment of CDOs as SFAS 157

Level 3 assets, also rendered the Sarbanes-Oxley Act Section 302

certifications executed by Defendants Lewis and Price and

appended to BAC's third quarter 2007 Form 10-Q false and

misleading because they did not disclose this material change in

BAC's internal controls" (Pls.'s Reply Mem. at 7-8 n.9, <u>citing</u>

Proposed SAC ¶¶ 83-97; 15 U.S.C. § 7241(a)).  If the proper

writedowns had taken place, continue plaintiffs, BAC's Federal

Deposit Insurance Company ("FDIC") rating would have been

downgraded from "well capitalized" to "adequately capitalized,"

seriously impairing BAC's ability to raise capital through the

stock offerings at issue (SAC ¶¶ 4-5, 88-89).  Plaintiffs also

now argue that BAC failed to disclose in its third quarter 2007

10-Q that it had reclassified its CDOs as "super senior" despite

the fact that the quality of the underlying assets "widely

varied" (Proposed SAC ¶ 84).  Finally, plaintiffs now contend

that there is an unexplained "vast differential valuation between

the Form 8-K issued shortly before the Series K Securities

Offering and Form 10-K issued a month later" (Proposed SAC ¶

105).  These new allegations are still inadequate to withstand a

motion to dismiss.

First, many of plaintiffs' characterizations of BAC's
financial disclosures are facially inaccurate.  For example,
contrary to plaintiffs' allegations, BAC disclosed that it
reclassified certain CDO assets from SFAS 157 Level 2 to SFAS 157
Level 3 in its 2007 third quarter 2007 10-Q, filed on November 9,
2007:

> During the three months ended September 30, 2007,
> certain financial instruments, including certain
> asset-backed securities issued by CDOs and portfolios
> of loans held-for-sale, were transferred from Level 2
> to Level 3 due to the lack of current observable market
> activity.  These instruments were valued using pricing
> models and discounted cash flow methodologies
> incorporating assumptions that, in management's
> judgment, reflect the assumptions a marketplace
> participant would use at September 30, 2007.

(Bank of America 10-Q, dated Nov. 9, 2007 ("BAC Nov. 9, 2007 10-
Q") at 35, annexed as Exhibit A to Declaration of B. Andrew
Bednark, Esq., in Support of the BAC Defendants' Opposition to
Plaintiffs' Motion for Leave to File a Second Amended Class
Action Complaint, dated Apr. 20, 2012 (Docket Item 69)("Bednark
Decl.")).  Moreover, BAC's January 22, 2008 8-K, filed prior to
the Series K offering, and incorporated into the registration
statement, did disclose the nearly $4 billion in mark-to-market
CDO writedowns that plaintiffs allege were only finally disclosed
in BAC's February 28, 2008 10-K (Bank of America 8-K, dated Jan.
22, 2008 ("BAC Jan. 22, 2008 8-K") at 30, annexed as Exhibit B to

Bednark Decl.).   There is also no discrepancy, as plaintiffs

allege, between BAC's January 22, 2008 8-K and its February 28,

2008 10-K relating to writedowns in BAC's "CDO Warehouse" and

"Sales and Trading" accounts; both disclose the same valuations

of the underlying assets (see BAC Jan. 22, 2008 8-K at 5, 30;

Bank of America 10-K, dated Feb. 28, 2008 ("BAC Feb. 28, 2008 10-

K"), at 29, 104-06, 139, annexed as Exhibit C to Bednark Decl.).

Finally, BAC's third quarter 2007 reclassification of its CDOs as

"super senior" had nothing to do with misrepresenting the quality

of the assets the CDOs contained, as plaintiffs argue.   Rather,

the "super senior" label referred to the payment priority of the

CDOs, as was clearly disclosed in BAC's third quarter 2007 10-Q

(BAC Nov. 9, 2007 10-Q at 78).   In sum, much of the information

that plaintiffs claim BAC was allegedly trying to "mask,"

including the purported deferral of writedowns and shifting of

CDO-related assets from SFAS 157 Level 2 to Level 3, was, in

fact, disclosed prior to the securities offerings at issue.

         With respect to BAC's VAR models, plaintiffs cite the

following passage from BAC's February 28, 2008 10-K, found under

the heading "Trading Risk Management," as evidence that BAC had

excluded CDOs from its risk models in late 2007:

              During the second half of 2007, CDO-related markets
              experienced significant liquidity constraints impacting
              the availability and reliability of transparent pricing

40

> resulting in the valuation of CDOs becoming more
> complex and time consuming.  Accordingly, it was not
> possible to mark these positions to market on a daily
> basis.  As a result, we recorded valuation adjustments
> in trading account profits (losses) of approximately
> $4.0 billion on certain discrete dates relating to our
> super senior CDO exposure.

(Proposed SAC ¶ 94, <u>quoting</u> BAC Feb. 28, 2008 10-K at 63).

However, as defendants correctly note, this passage only

indicates that CDOs were not valued on a <u>daily</u> basis, not that

CDOs were excluded from BAC's risk models entirely (Opp'n Mem. at

20).  In fact, despite the volume of new allegations in the

proposed SAC, plaintiffs cite no affirmative representations by

BAC in its third quarter 2007 10-Q regarding the nature and

extent to which CDOs were included within -- or excluded from --

its VAR models.  Without any such representations, there can be

no misrepresentations for Securities Act purposes.

Additionally, because plaintiffs' argument that

defendants violated Sarbanes-Oxley Act Section 302 is predicated

on the BAC's alleged material misrepresentations with respect to

its VAR models, it also fails to state a claim under the

Securities Act.  Internal controls, such as risk models, exist to

ensure that officers are regularly apprised of material

information.  <u>See</u> Robert Prentice, <u>Sarbanes-Oxley: The Evidence</u>

<u>Regarding the Impact of Sox 404</u>, 29 Cardozo L. Rev. 703, 706

(2007).  The deficiencies that plaintiffs allege, however, do not

Case 14-402, Document 48, 05/22/2014, 1231463, Page99 of 107
SPA-42
Case 1:10-cv-00440-LAK-HBP   Document 77   Filed 02/15/13   Page 42 of 48

relate to the putative inadequacy of BAC's internal controls in providing material information to BAC's officers, but to the actions taken by BAC's officers once they had such information, i.e., their decisions regarding classification and valuation of CDO assets.

In sum, plaintiffs' new accounting allegations fail to state a claim because they simply do not demonstrate that any statements by BAC were "both objectively false and disbelieved . . . at the time [they were] expressed." Fait v. Regions Fin. Corp., supra, 655 F.3d at 110.  As most, plaintiffs' allegations still show only that BAC overvalued illiquid assets whose valuation was highly subjective, and as a result, failed to take sufficient writedowns during the relevant time period.  "In the absence of . . . an affirmative misrepresentation, allegations of 'garden-variety mismanagement, such as managers failing to . . . adequately inform themselves' do not state a claim under federal securities laws."  In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (Rakoff, D.J.).  The mere fact that writedowns stemming from the use or non-use of BAC's VAR models subsequently turned out to be insufficient does not render those figures false at the time that they were made part of BAC's public filings with the SEC, see Zirkin v. Quanta Capital Holdings Ltd., supra, 2009 WL 185940 at *10, especially because

the assets at issue were "not traded on the New York Stock
Exchange or some other efficient market," and are assets for
which the value is generally a matter of subjective opinion.
Fait v. Regions Fin. Corp., supra, 712 F. Supp. 2d at 122 & n.38;
see also Tsereteli v. Residential Asset Securitization Trust
2006-A8, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010) (Kaplan, D.J.);
Yu v. State St. Corp., supra, 686 F. Supp. 2d at 379; Fraternity
Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349,
361-63 (S.D.N.Y. 2007) (Kaplan, D.J.).

          Therefore, for all the foregoing reasons, I conclude
that, even considering plaintiffs' new improper accounting
allegations, the proposed SAC still fail to state a claim under
the Securities Act.[14]

                 b.   Allegations Relating to
                      Countrywide Acquisition

          The remainder of the plaintiffs new allegations focus
on alleged misrepresentations made by defendant Lewis in the
January 11, 2008 conference call, in particular, Lewis's
statement that "[t]he good news is much of the originations in

_____

          [14] Because I conclude that plaintiffs claims are
insufficient on their face, it is unnecessary to reach the issue
of whether BAC's VAR-related statements are protected by the
PSLRA's safe harbor or the "bespeaks caution" doctrine.

the current market are of much higher quality and better spreads than the past couple years." (Proposed SAC ¶ 121).  In my Report and Recommendation of February 9, 2012, I described this statement as the only statement that was "potentially actionable."  NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL 3191860 at *20-*21.  However, I went on to conclude that due to the "financial disclosures made by BAC concerning its increasing market exposure and plaintiffs' own allegations concerning the deteriorating market conditions during the relevant time period, it is not plausible that one generalized statement concerning Countrywide's originations as of January 2008 would cause the offering documents to be misleading within the meaning of the Securities Act."  NECA-IBEW Pension Trust Fund v. Bank of Am. Corp., supra, 2012 WL 3191860 at *22.  Nevertheless, plaintiffs now allege that documents produced by BAC to the FCIC, and not publicly released until February 2011, demonstrate that Lewis's "higher quality" statement was objectively false at the time it was made, and that given BAC's pre-acquisition due diligence, it also could not have been believed (Proposed SAC ¶¶ 121-31).  Plaintiffs' new allegations remain insufficient to withstand a motion to dismiss.

        According to plaintiffs, the FCIC data demonstrate, inter alia, that FICO scores and combined loan-to-value ratios

for Countrywide's originations were "substantially similar" at
the end of 2007 to the same measurements for the years 2004-2006,
and thus any representation that the quality of the originations
was improving was false (Proposed SAC ¶¶ 127-31).[15]  However, the
data cited by plaintiffs show that at the end of 2007, average
FICO scores for Countrywide originations <u>were</u> improving and
combined loan-to-value ratios were decreasing (Countrywide
Response to June 23 Request: 4(a)-(p), annexed as Exhibit A to
Proposed SAC).  Additionally, the data indicate that by the end
of 2007, Countrywide had significant reductions in Alt-A and Pay
Option originations, two of the riskiest classes of mortgages
(Countrywide Response to June 23 Request: 4(a)-(p), annexed as
Exhibit A to Proposed SAC).  Thus, the exhibits annexed to the
proposed SAC demonstrate that "Countrywide's originations as of
[early January 2008] . . . were an improvement over Countrywide's
originations of the prior years."  <u>NECA-IBEW Pension Trust Fund
v. Bank of Am. Corp.</u>, 2012 WL 3191860 at *21.

        Even if the FCIC data were otherwise, however,
plaintiffs' allegations would still be inadequate for the reasons
stated in the February 9, 2012 Report and Recommendation, namely,

_____

        [15] Plaintiffs do not appear to be arguing that the FCIC data
show Countrywide originations becoming riskier or worsening in
quality; rather, they only allege that they did not improve.

that Lewis's statement was brief, generalized, and made "in the
context of BAC's November 2007 financial disclosures that: (1)
its provisions for credit losses had increased; (2) its net
charge-offs had increased; (3) the relevant financial markets
were experiencing extreme dislocations, and further, BAC
predicted continuing adverse impacts on its future financial
performance as a result of those dislocations; (4) it had CDO and
loan exposure, including subprime exposure and (5) its allowance
for loan and lease losses had increased." <u>NECA-IBEW Pension
Trust Fund v. Bank of Am. Corp.</u>, 2012 WL 3191860 at *22. Thus,
even if the statement were false, the context in which it was
disseminated neutralized its potential to be misleading and
actionable under the Securities Act.

Therefore, for all the foregoing reasons, I conclude
that plaintiffs' Countrywide-related allegations still fail to
state a claim under the Securities Act, and that granting leave
to file a second amended complaint would thus be futile.

c.   <u>Section 15
Claims</u>

Plaintiffs continue to assert claims under Section 15
of the Securities Act against all individual defendants. Section
15 "creates liability for individuals or entities that 'control[]

any person liable' under Sections 11 or 12 [and its] . . .
success . . . relies, in part, on a plaintiff's ability to
demonstrate primary liability under [S]ections 11 and 12."   In re
Morgan Stanley Info. Fund Sec. Litig., supra, 592 F.3d at 358.

     Because plaintiffs have still not adequately alleged
Section 11 and Section 12(a)(2) claims with respect to the Series
H and Series K offerings, their proposed SAC necessarily fails to
state a claim under Section 15 against each of the individual
defendants.   Lieberman v. Cambridge Partners, LLC, No. Civ. A.
03-2317, 2003 WL 22999217 at *4 (E.D. Pa. Dec. 16, 2003)
(collecting cases), aff'd on other grounds, 432 F.3d 482 (3d Cir.
2005).

IV.   Conclusion

     For all the foregoing reasons, I plaintiffs' motion for
leave to file a second amended class action complaint is denied.

Dated:   New York, New York
       February 15, 2013

                        Respectfully submitted,

                        HENRY PITMAN
                        United States Magistrate Judge

SPA-48

Copies transmitted to:

Mark L. Knutson, Esq.
Jeffrey R. Krinsk, Esq.
C. Michael Plavi, Esq.
Finkelstein & Krinsk LLP
Suite 1250
501 West Broadway
San Diego, California  92101

Jeffrey A. Klafter, Esq.
Klafter, Olsen & Lesser, LLP
Suite 350
Two International Drive
Rye Brook, New York  10573

Jonathan Rosenberg, Esq.
William J. Sushon, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York  10036

Jay B. Kasner, Esq.
Scott D. Musoff, Esq.
Skadden, Arps, Slate,
    Meagher & Flom LLP
42nd floor
Four Times Square
New York, New York  10036

48

SPA-49

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
NECA-IBEW PENSION TRUST FUND and
DENNIS MONTGOMERY, on behalf of
themselves and all others similarly situated,
                              Plaintiff,

                -against-

BANK OF AMERICA CORPORATION, et al.,
                              Defendant.
--------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/9/2014
```

10 **CIVIL** 440 (LAK)(HBP)

**JUDGMENT**

Whereas the above-captioned action having come before this Court, and the matter having come before the Honorable Lewis A. Kaplan, United States District Judge, and the Court, on January 8, 2014, having rendered its Order directing the Clerk of the Court to prepare and file a judgment in accordance with the December 3, 2013order of this Court, Magistrate Judge Henry Pitman having issued a thorough opinion and order denying plaintiffs' motion for leave to file a second amended complaint; Plaintiffs appeal and objections on several grounds and contend that this Court must review de novo, the Second Circuit, however, previously has treated motions for leave to amend as a non-dispositive motions, the Court agreeing with Magistrate Judge Pitman's order, and finding that plaintiffs' objections are without merit; accordingly, affirming the order appealed from, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Order dated January 8, 2014, judgment is hereby entered in accordance with the December 3, 2013 Order the Court having agreed with Magistrate Judge Pitman's order and finds that plaintiffs' objections are without merit; accordingly, the order appealed from is affirmed.

**Dated:**  New York, New York
January 9, 2014

RUBY J. KRAJICK

Clerk of Court

BY:

Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____